Marcus D. SWAN, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

and

D'Andre Owens, Appellant,

v.

Commonwealth of Kentucky, Appellee.

Nos. 2011–SC–000085–MR,
2011–SC–000086–MR.

Supreme Court of Kentucky.

Aug. 23, 2012.

As Corrected Sept. 11, 2012.

As Modified on Denial of Rehearing
Dec. 20, 2012.

80

Theodore S. Shouse, Louisville, KY, Counsel for Appellant, Marcus D. Swan.

Daniel T. Goyette, Louisville Metro Public Defender, Cicely Jaracz Lambert, Assistant Appellate Defender, Office of the Louisville Metro Public Defender, Louisville, KY, Counsel for Appellant, D'Andre Owens.

Jack Conway, Attorney General, James Daryl Havey, Office of the Attorney General, Frankfort, KY, Counsel for Appellees.

Opinion of the Court by Justice NOBLE.

The Appellants Marcus D. Swan and D'Andre Owens were tried and convicted of multiple crimes related to a violent home invasion they carried out in 2008 in which they stole money and threatened to kill the home's inhabitants, two of whom they ultimately shot and one of whom they threatened to rape and sodomize. They raise numerous issues on appeal, some in common and others independently. The Court hereby affirms Swan's judgment of conviction and sentence in its entirety, and affirms in part and reverses in part Owens's judgment, though his overall sentence is unaffected.

## I. Background

Brandon Lumpkins owned a two-bedroom house in Louisville. He lived there with his girlfriend, two-year-old daughter, his mother, and his six-year-old brother. According to Lumpkins, he had a reputation as a drug dealer because he had money from a lawsuit that had allowed him to buy the house, a truck, and guns. As a result, he received robbery threats. He kept six guns in the house, all loaded and in his bedroom.

On May 8, 2008, Lumpkins's sister and two friends were visiting. The sister sat for a while on the front porch with her boyfriend, who left after midnight. While outside, she saw a white car pull up with its lights off but thought nothing of it. When she came back into the house, she left the front door unlocked. Lumpkins's mother had gone to bed in the back bedroom; the others were all in the front room of the house.

A short time later, two men armed with guns entered the house. They were wearing latex gloves and had duct tape. The smaller one was Marcus Swan; the other man was D'Andre Owens. They ordered everyone into the living room. The men began yelling for money, drugs, and guns, and one fired a shot into the ceiling. One of the witnesses testified that Owens was giving the orders, but that Swan, who had a bandana over his face, said things like "Don't nobody move or I'm 'a kill ya! This ain't no f——g game, it's a robbery!"

Swan and Owens told Lumpkins that they knew about him, presumably referring to his reputation. Lumpkins testified that one of the men pulled out a small bag of marijuana and asked where his stash of the drug was. Lumpkins said that he had none, and Owens struck him in the head several times with a gun; Lumpkins blocked at least one of the blows with his hand, which started to bleed. Owens said that he would kill everyone in the house if Lumpkins did not give up his money. Lumpkins replied that he had no money in the house, though he had a $100 bill in his pocket, which he claimed to have turned over to the robbers. Despite this claim, no such bill was recovered from the scene or from Swan or Owens.

Lumpkins's sister called 911 on a cellular phone and unsuccessfully tried to whisper the location of the house. Having just washed her hair, she had a towel on her head, which she used to hide what she was doing. One of the friends laid over her to help muffle the sound. One of the men fired his gun into the fireplace next to the

friend, temporarily deafening him. The men then moved the friend away from Lumpkins's sister.

Swan and Owens were angry that they obtained so little of value from their robbery. Owens shot Lumpkins in the left thigh. Swan shot one of Lumpkins's friends in the thigh also. Swan later shot Lumpkins in the right ankle. After this second shot, Lumpkins's sister turned over several hundred dollars she had tucked in her clothes. In the meantime, Lumpkins's girlfriend had been awakened by the shouting. She stepped out into the hallway, saw Owens with a gun, and, unnoticed, stepped back in the bedroom and hid with her daughter. Swan later came in the room and found her; Owens came in and dragged her back to the living room by her hair. He yelled profanities at her and told her that he was going to rape her. He then bent her over the arm of a sofa and pulled her panties up over the waist of her pants. Owens unzipped his pants and declared that he was going to make Lumpkins's sister perform oral sex on him. Apparently, he never carried through with this threat.

The two-year-old daughter walked into the hallway. Owens put his gun to her head and threatened to kill her. He then tapped her head with the gun and told her to get on the couch.

Lumpkins's mother, Latonia Lumpkins, was also awoken by the shouting and gunshots. She hid under the bed when Swan and Owens came in the room and searched through it. She called 911 and was able to give the address of the house.

Owens took Lumpkins's six-year-old brother through the house with a gun to his head. Ms. Lumpkins heard Owens say he would kill the boy if he did not reveal where Lumpkins kept his money. She also heard Owens tell the boy to get him a purse that was on the bed.

Over the course of the robbery and assaults, the Appellants threatened to kill everyone, including the children. Sometimes they made broad threats to just start shooting; other times, they made specific threats, such as to make the children watch as they killed the adults.

Police quickly responded to the 911 call. After arriving at the scene, they began surrounding the house and heard shots from inside. Swan and Owens, seeing the officers and their cars, again threatened to kill everyone in the house. Instead of further violence, they tried to leave through the back door, where they were confronted by one of the officers. The men went back into the house. According to Ms. Lumpkins, at some point, the men came into her room and hid their guns in the closet. Five minutes after trying to go out the back door, Swan exited the house and surrendered himself to the police. Owens stayed and continued to threaten to kill the people in the house. A few minutes later, he too left the house and was taken into custody.

Police found a camera, latex gloves, some money, and other items on Swan when he was arrested. During a search of the house, with the assistance of an ATF agent, police found eight firearms. Two loaded .357–caliber revolvers were found in a closet in the back bedroom under some clothing or blankets. One of these guns was a Smith & Wesson with one spent shell in the cylinder; the other was a High Standard with four spent shells in its cylinder. According to Detective Michael Fields, the guns smelled of gunpowder from having recently been fired. Six other loaded guns were found in the other bedroom. Though these guns turned out to belong to Lumpkins, they were still seized as evidence at the scene at that time.

Swan and Owens were charged with multiple counts of robbery, assault, wanton endangerment, and one count each of burglary and tampering with physical evidence. In addition, Owens was charged with attempted sodomy. At trial, the Commonwealth offered testimony and physical evidence consistent with the facts described above. Swan and Owens did not take the stand and called only one of the investigating officers to testify.

The jury found Swan guilty of four counts of first-degree robbery, one count of first-degree burglary, two counts of first-degree assault, six counts of first-degree wanton endangerment, and one count of tampering with physical evidence, all by a complicity theory. The jury recommended the maximum sentence on each count, all to be served consecutively. Swan was eventually sentenced to the statutory maximum 70 years.

Owens was convicted of the same charges, again all under a complicity theory, with the addition of one count of attempted first-degree sodomy as a principal. The jury again recommended the maximum sentence on each count, all to be served consecutively. Owens was eventually sentenced to the statutory maximum 70 years.

Their appeals followed as a matter of right to this Court. *See* Ky. Const. § 110(2)(b). Because Swan and Owens were tried together, their appeals have been joined and have been heard together.

## II. Analysis

Swan and Owens have two issues in common, both related to the guns found in the house. These issues are addressed together; the other issues they raise are addressed separately below.

### A. Issues Common to Swan and Owens

Swan and Owens complain about the admission of the guns used in their crime and the destruction of firearms belonging to one of the victims prior to trial.

#### 1. The trial court did not err in admitting into evidence the guns used in the crime.

Swan and Owens claim that the trial court erred in allowing admission of the guns used in the crime because, they claim, they had already been ordered suppressed. They also complain that because the guns were thought lost for a time, they were prevented from examining and testing them, which they claim would have aided in their defense. Ultimately, this Court concludes that this issue was waived and not properly preserved for appellate review, and did not prejudice Swan and Owens.

The police recovered the .357–caliber revolvers used in the crimes soon after arresting Swan and Owens. The guns were logged on a seized-property form and kept in the police property room. Photographs of these and other items were provided to defense counsel in pre-trial discovery.

More than two years after the crimes were committed, and approximately two-and-a-half weeks before trial, Swan's and Owens's lawyers went with the prosecutor and Detective Fields to the police property room to view the items collected at the scene. Police were unable at that time to find several items, including the handguns recovered at the scene, the empty shell casings found in those guns, and bullet fragments.[1] A week before trial was to begin, the Commonwealth still had not found the guns.

---

1. Though bullet fragments were discussed, it is not clear that any were ever collected based on the testimony of some of the police officers.

On the first morning of trial, Owens's lawyer orally raised issues related to the lost items, stating that apparently the guns had been found. The prosecutor agreed that they had been found and noted that the guns were available for court that day. The judge said, "You all can take a look at that at a break or something like that." Owens's lawyer responded, "Okay," and then asked what kind of guns they were. Detective Fields was present, answered this question, and also stated that the guns had not been tested for ballistics or fingerprints. Owens's lawyer then noted that other items—specifically the shell casings and bullet fragments—were missing and had not been tested. She asked that these items be excluded on those grounds. She then deferred to Swan's lawyer to argue his similar written motions.

Swan's lawyer had filed numerous motions in limine, including one to prohibit introduction of evidence not provided under the court's discovery orders and one to dismiss the indictment or alternatively to exclude specific evidence (namely the items that the police had not been able to locate two weeks before). When the court mentioned this latter motion, Swan's counsel stated: "One item has been resolved, apparently, the .357 handguns. That particular motion." The judge stated, "So you know about that." Swan's counsel replied, "Yes, sir."

The judge then moved on to discuss the shell casings and other items, asking what was going on with those items. Swan's counsel described that the items had been missing when he and Owens's counsel went to examine them a few weeks before. Detective Fields spoke up then and explained that the property room's inventory system had changed between the crimes and trial, and that the missing items had been filed under the old system, which made them difficult to locate. Nevertheless, the guns and other items had been located.

Orally, the judge told the Commonwealth to have the other items brought from the property room to court for defense counsel to examine. He added that he would let the lawyers view these items and then raise their objections again, if they had any. The judge also noted that the evidence had not been lost and instead had just been misplaced.

On the order tendered by Swan's counsel with his motion to dismiss or exclude specific items, the trial court wrote "denied" over the part of the tendered order relating to dismissing the indictment and "submit—counsel to review evidence prior to intro" below the portion that would have excluded the items from evidence.

The court then went on to address the motion to exclude any evidence not provided pursuant to discovery orders (such as that entered at arraignment). The judge said that if the Commonwealth sought to introduce any such evidence the motion was sustained. The court simply signed the order tendered with this motion, which included only the generic description "evidence not provided pursuant to this Court's discovery orders."

Later, when the various investigating officers were set to testify, defense counsel objected to some of these items. When the court noted it had already ruled on the motions, counsel stated they wanted to renew their objections at that time because they had had a chance to see the items. They argued that the shell casings, some clothing, latex gloves, and DNA samples had not been subjected to testing or independent testing. The court agreed to exclude the shell casings on the theory that the defense had a right to see them and to ask that they be independently tested, and that the items had not been available two weeks before when counsel went to see

them. When the prosecutor noted that defense counsel had known about all this material but had never asked that it be tested, the court responded that defense counsel nevertheless had a right to have examined the materials before trial and to have asked for a continuance to have the materials examined. Interestingly, when asked whether he would have granted such a continuance, the judge said, "No, of course not."[2] The handguns themselves were not mentioned at this time.

Later, when an ATF agent was testifying about the guns found at the crime scene, defense counsel asked to approach and to "make the same motion for exclusion for the .357 that [he] did for the shell casings." The court denied the motion.

■ Both Swan and Owens now complain that the eventual admission of the handguns into evidence violated the order excluding evidence not provided pursuant to discovery orders. Indeed, both claim that this issue is preserved by the trial court's ruling on that motion.

It is very clear after this Court's review of the record that the motion to exclude evidence not provided pursuant to discovery orders was not aimed at the handguns; more importantly, it is clear that the trial court's order granting this motion did not cover that evidence. That this could not be clearer is shown by the facts that a *separate* motion specifically addressed the handguns, that this motion was discussed just a moment before the discovery-order motion, and that the court separately ruled on this motion. In presenting their arguments as they have and ignoring the separate motions made at trial, it seems that appellate counsel either did not review the record very carefully or they have decided

to push the boundaries of the duty of candor to a tribunal to its limits.[3] Owens's counsel, at least, appears to have recognized that there were two different motions and rulings, but she argues that the trial court's rulings were inconsistent and arbitrary. Because the motion to exclude evidence not provided under the discovery orders and the court's resolution of this motion did not cover the guns, they cannot be deemed to have preserved this issue for appellate review.

■ Moreover, this Court's independent review of the record shows that this issue is not only unpreserved, it was also waived. As described above, both Swan's and Owens's trial counsel were satisfied once the guns were found and made available for their examination. When the judge told Owens's counsel that she could look at the guns at a break, she said only "okay," and raised no further complaint, asking instead what kind of guns they were. And when Swan's counsel was asked about the guns, he stated that the complaint about them had been "resolved." This is a clear waiver of any complaint about the guns based on their having been "lost." (Notably, neither appellate counsel discusses these clear waivers, which further undermines this Court's confidence that the arguments are now made in good faith.)

Admittedly, the trial court did say when discussing the other items he ordered the Commonwealth to make available, such as the shell casings, that defense counsel could examine them and then renew their motions. But again, that part of the discussion was aimed only at the additional items. The concerns about the guns had already been resolved. Indeed, the guns

2. This trial was almost 2 ½ years after the indictment and there had been multiple continuances.

3. Both Swan and Owens are represented by different counsel on appeal than at trial.

had already been brought to the court-room.

■ To the extent that the "renewal" of the motion when the ATF agent was testifying was sufficient to overcome the waiver or to preserve the issue, the complaint is not well taken because no prejudice is evident. As the Commonwealth notes, defense counsel had almost two years to ask to examine the guns and request independent testing. But they waited until just a few weeks before trial to even try to look at the evidence, which implies that they had no plans to ask for independent testing. At such a late point, a request for testing could only have been used for delay, which points to a forfeiture of any right to complain. Moreover, defense counsel did not even ask for a continuance at that time and instead asked only for an extreme remedy, exclusion of the evidence. The burden of showing prejudice is on the defendant claiming the error. That Swan and Owens *could have* asked for testing or *might* have theorized that the .357–caliber revolvers were not the guns used in the crimes is insufficient to demonstrate prejudice, which is a prerequisite for this Court to reverse absent a structural error. *See* RCr 9.24.

### 2. The trial court did not err in failing to dismiss the indictment because of the destruction of other guns found in the victims' house.

■ Swan and Owens also claim that the trial court should have dismissed the indictment against them because six guns that had been found at the scene of the crime had been intentionally destroyed before trial. This Court concludes that the motion to dismiss the indictment was properly denied.

When the police finally entered Brandon Lumpkins's home, they found six guns—a pistol, two revolvers, a shotgun, a hunting rifle, and a semi-automatic assault rifle, none of which was .357 caliber—in addition to the two that had been used in the crimes. These guns were found in a different location in the house than the .357–caliber handguns, and they belonged to Brandon Lumpkins. Two months after the guns were seized, in July 2008, Lumpkins had a conversation with ATF agents, a Louisville Police detective, and his mother in which he agreed to surrender the guns for destruction. According to an ATF report, Lumpkins's mother was concerned that he had expressed suicidal thoughts after being "disabled" by Swan and Owens, and that he might hurt himself with the guns as a result. Lumpkins signed an ATF form titled Notice of Abandonment of Property and Release of Claim that listed all six guns. By signing the form, he abandoned the guns to the ATF and gave up any rights or claims related to the guns. In February 2009, Swan and Owens were provided copies of this release form in discovery from the Commonwealth. In January 2010, the ATF destroyed the weapons.[4]

At trial, defense counsel vigorously cross-examined the ATF agent about the guns, focusing on whether any ballistic or fingerprint testing had been done on them to exclude them as having been used in the crimes. Defense counsel also asked several questions about the origins of the guns and whether Lumpkins legally owned the guns.

Twenty-one months elapsed between Swan's and Owens's arrest and the destruction of Lumpkins's guns. Neverthe-

---

4. Swan's and Owens' briefs incorrectly state that the weapons were destroyed in January 2009, despite clear testimony in 2010 from the ATF agent that the weapons were destroyed "this year." Owens' reply brief admits and apologizes for the error.

less, neither Swan nor Owens raised any issue about Lumpkins's guns until the close of all the evidence. At that time, they moved to dismiss the charges on the grounds that the guns had been destroyed and they were thus prevented from testing them.

Swan and Owens now argue that their rights were violated because they could not do ballistics and fingerprint[5] tests on these guns after their destruction. Specifically, they argue that due process is violated when the government loses or otherwise fails to preserve potentially exculpatory evidence.

To begin with, it is not clear that an objection at the close of all the evidence is sufficient to preserve such a claim for appellate review. Swan and Owens certainly knew no later than the ATF agent's testimony that the guns had been destroyed and could have made their motion then. And Owens notes in his reply brief that his trial counsel discovered the destruction of the guns prior to the testimony when talking to the ATF agent in the hallway.

■ Assuming that the late objection was sufficient and that a remedy of some sort was appropriate, Swan and Owens have failed show that there was an error in this case. To establish a due process violation based on missing evidence, a defendant must show two things.

First, "the evidence must either be intentionally destroyed, or destroyed inadvertently outside normal practices." *Tamme v. Commonwealth*, 759 S.W.2d 51, 54 (Ky.1988). There is no question that the guns were intentionally destroyed.

Second, "the evidence must 'possess an exculpatory value that was apparent before it was destroyed.' " *Id.* (quoting *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413, (1984)). While this is certainly the more difficult question, this Court ultimately concludes that Swan and Owens have failed to show that the guns even had an exculpatory value, much less one that was apparent before they were destroyed.

Essentially, much of Swan's and Owens's defense at trial was aimed at showing that Brandon Lumpkins was a drug dealer, which was helped by proof of several hundred dollars in cash and the bag of marijuana having been found in the house, and an admission by at least one of the victims that they had previously sold marijuana. It is unclear whether the intent of this defense was to show that the alleged home invasion and assault were really a drug deal gone bad or simply to paint Lumpkins as a bad person (despite his indisputable injuries received during the incident). Even assuming that evidence of what they describe as an "arsenal" tended to show that Lumpkins was a drug dealer—a rather tenuous claim—such evidence would not be exculpatory. Neither of these theories springing from Lumpkins's being a drug dealer is a legitimate defense to the crimes of which the jury ultimately convicted Swan and Owens. It is still a crime to assault and rob a drug dealer.

Nor is it clear why testing of the weapons would have been exculpatory since there is no other evidence to identify another shooter. Speculation is not exculpation as required by *Tamme* and *Trombetta*, and no supporting exculpatory facts were "apparent" at the time the weapons were destroyed.

---

5. It is not clear what value fingerprint tests would have had, since Swan and Owens were alleged to have worn latex gloves during the crime. At best, such tests could have matched the guns to someone other than Swan and Owens, such as Brandon Lumpkins, who undisputedly owned the guns.

■ Swan and Owens note that the U.S. Supreme Court has focused on whether the government acted in good faith in handling evidence in deciding whether a due process violation occurred. *See Arizona v. Youngblood,* 488 U.S. 51, 57–58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *see also Collins v. Commonwealth,* 951 S.W.2d 569, 573 (Ky.1997) (applying good faith test to failure to collect evidence). They argue that because the weapons were intentionally destroyed without notice while the Commonwealth was under a court-ordered discovery obligation, and Louisville Police were present when the abandonment document was signed, then the government must have acted in bad faith. But as the Supreme Court has noted, the bad-faith requirement "limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333.

Under these facts, that the federal government, perhaps with an assist by state or local government, decided to destroy weapons owned by a criminal assault victim, with that victim's permission, does not show bad faith. The ATF frequently destroys weapons abandoned or forfeited to it and is in fact statutorily authorized to do so. *See* 26 U.S.C. § 5872(2). Swan and Owens knew of the existence of these guns, which were available for examination and testing in the Commonwealth's possession for over a year after the crime. They had notice that the guns had been abandoned to the federal government and thus were no longer in state custody. Finally and most importantly, there is simply no believable theory of how these guns, which no one disputes belonged to a victim, could have been exculpatory, even with the added *Youngblood*-inference of a nefarious purpose on the government's part based on the intentional destruction of the guns.

That no such believable theory could have been presented is underscored by the fact neither Swan nor Owens *ever* sought to have the guns tested, despite their counsel announcing ready the day of trial. Clearly, they were not interested in basing any theory on Brandon Lumpkins's guns because any such theory would have bordered on the ridiculous and been improper. Their complaint about the weapons only arose after they discovered the destruction at trial.

■ Even assuming that there was some minimal due process violation, this Court is convinced it would be harmless beyond a reasonable doubt. The Commonwealth's evidence at trial showed that these guns—an "arsenal," as Swan and Owens put it—were found in the victim's house and that a bag of marijuana was found there. This put the drug-dealer theory, however inappropriate, before the jury. There is nothing that admission of the guns themselves or testing of them would have added to this.

■ Finally, it is not clear that dismissal of all the charges would be an appropriate remedy for destruction of the evidence in this case even assuming that a prejudicial due-process violation could be shown. As this Court has noted, dismissal is only one of several remedies available for such violations. *See, e.g., Sanborn v. Commonwealth,* 754 S.W.2d 534, 540 (Ky. 1988). Other remedies, such as exclusion of evidence or a missing-evidence instruction to the jury, may be appropriate depending on the facts. *Id.* In fact, our law appears to express a preference for missing-evidence instructions, which are used "to cure any Due Process violation attributable to the loss or destruction of excul-

patory evidence by a less onerous remedy than dismissal or the suppression of relevant evidence." *Estep v. Commonwealth,* 64 S.W.3d 805, 810 (Ky.2002). A missing-evidence instruction specifically allows the jury to draw an inference against the Commonwealth from the fact that evidence is missing, lost, or destroyed. Yet neither Swan nor Owens asked for such an instruction. Given the facts in this case, such an instruction is the most they could have received, and it would not have been error for the trial court to decline to give it.

### B. Issues Raised by Swan

In addition to the issues he has in common with Owens, Swan raises three issues independently. He claims that the trial court erred by failing to hold a hearing when he asked to participate in his own representation; by allowing Brandon Lumpkins's mother, Latonia, to testify in the sentencing phase after having been present in the courtroom during the guilt phase; and in allowing Brandon Lumpkins's little brother to testify without holding a meaningful competency hearing outside the presence of the jury.

### 1. The trial court did not err in failing to hold a hearing on Swan's right to proceed pro se or with hybrid counsel.

Swan argues that the trial court violated his right to proceed pro se or as co-counsel with a hybrid form of representation without holding a hearing to confirm that he was waiving those rights knowingly, intelligently, and voluntarily.

At a pre-trial conference approximately a week before trial, Swan clearly asked to participate in his own defense. On the record, he can be heard asking his counsel the following: "Tell her [the judge] that I want to represent myself as co-counsel." His lawyer did not follow this instruction,

so he raised the issue himself, clearly telling the court that he wanted to represent himself as co-counsel in the following exchange:

Swan: I want to represent myself as my own co-counsel during the rest of the trial if it okay with the court.

Court: Why would you want to do that?

Swan: Because I want to be able to speak on my own case.

Court: Okay. You understand—

Swan: If I feel something's going wrong.

Court: You understand you're represented by an attorney. You don't have a law degree. He does.

Swan: Right. But I still would like to say something if I feel something's out of place during trial.

Court: Why don't you say something to your attorney and you can work on it together.

Swan: So, it is my right, you know what I am saying, to be able to speak. So you telling me I can't speak?

Court: It's not exactly your right to serve as your own attorney. You can make, depending on if I feel that it is knowing and voluntary, which I'm not sensing from you today. But we can raise the issue again at trial and I can conduct a full *Faretta* hearing. So well do that the morning of trial.

Swan's Counsel: Thank you.

Court: It appears unwise, okay.

When the case proceeded to trial the following week, the case was presided over by a different judge. The case had originally been assigned to Judge Audra Eckerle, who presided over all the pretrial matters. She became unavailable for the scheduled start of the trial. Judge Geoffrey Morris was appointed special judge in her place and presided over the trial. De-

spite the appointment of a new judge on the case, Swan did not again request to proceed as co-counsel. No hearing on Swan's earlier request was ever held.

 As Swan points out, a criminal defendant has a federal constitutional right to proceed pro se. *See Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The federal constitution does not grant a right to hybrid counsel, i.e., where the defendant is co-counsel with his lawyer, though such an arrangement may be allowed at the discretion of the trial judge. *McKaskle v. Wiggins*, 465 U.S. 168, 183, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). Kentucky's constitution, however, gives criminal defendants the right to hybrid counsel, which is seen as acting pro se in part. *See Wake v. Barker*, 514 S.W.2d 692, 695 (Ky.1974) (reading such a right in the language of Section 11 of the Kentucky Constitution that allows a defendant "the right to be heard by himself and counsel").

 Similarly, criminal defendants have a right to counsel, which of course may be waived. But the exercise of the right to proceed pro se or to have hybrid representation necessarily requires the defendant to forgo the right to counsel, either in whole or in part. *United States v. Conder*, 423 F.2d 904, 908 (6th Cir.1970) ("The right to defend pro se and the right to counsel have been aptly described as 'two faces of the same coin,' in that the waiver of one right constitutes a correlative assertion of the other." (quoting *United States v. Plattner*, 330 F.2d 271, 276 (2d Cir.1964))). The right to counsel is so important that we require trial courts to first ascertain whether the relinquishment of the right in favor of the pro se right is knowingly, voluntarily, and intelligently made. *See Faretta*, 422 U.S. at 835, 95 S.Ct. 2525; *Depp v. Commonwealth*, 278 S.W.3d 615, 617 (Ky.2009). This is done

by having what has come to be known as a "*Faretta* hearing," at which the trial court is required to inform the defendant of the dangers and consequences of the decision. *Hill v. Commonwealth*, 125 S.W.3d 221, 226 (Ky.2004), *holding modified by Depp v. Commonwealth*, 278 S.W.3d 615 (Ky. 2009). At the end of the hearing, the court must determine whether the waiver is knowing, intelligent, and voluntary. *Id.*

 Perhaps more importantly, once a defendant invokes his right to proceed pro se, in whole or part, the trial court is required to hold the *Faretta* hearing and allow the defendant to exercise the right, if at all possible. *Id.* at 228; *see also Grady v. Commonwealth*, 325 S.W.3d 333, 342 (Ky.2010) ("[W]e reiterate that a *Faretta* hearing, while required when a defendant invokes his *Faretta* rights...."). The failure to do so is a structural error that requires reversal without determining whether the error was harmless. *Hill*, 125 S.W.3d at 228; *Grady*, 325 S.W.3d at 342. To invoke the right, the defendant must make his request in a timely and unequivocal fashion. *Major v. Commonwealth*, 275 S.W.3d 706, 719 (Ky.2009). A court must inquire into whether a defendant wants to waive his right to counsel only when that right is invoked. In other words, the default approach in the law is that a defendant is presumed to want to exercise his right to counsel over his right to proceed pro se in whole or in part, meaning that a court need not confirm in every case that a defendant is waiving his right to dispense with counsel. *See Brown v. Wainwright*, 665 F.2d 607, 610 (5th Cir.1982) ("Because of the important and well-recognized benefits associated with the right to counsel, it is preeminent in the sense the right attaches unless affirmatively waived. The mere failure to request counsel will not be deemed a waiver. While the right to counsel is in force until waived, the right of

self-representation does not attach until asserted." (citations omitted)).

◼ In light of this law, Swan claims that his structural right to proceed with hybrid counsel was violated because the trial court never held a *Faretta* hearing. He correctly notes that his request was unequivocal. He is also correct that a request a week before trial is timely made. *See United States v. Bishop*, 291 F.3d 1100, 1114 (9th Cir.2002) ("A demand for self-representation is timely if made before meaningful trial proceedings have begun.... [A] request is timely if made before the jury is selected or before the jury is empaneled, unless it is made for the purpose of delay." (citation omitted)). In most instances, a trial court's failure to follow through with a *Faretta* hearing in such circumstances would be reversible error.

This case, however, is factually distinguishable from the ordinary case in which a defendant asks to proceed pro se or with hybrid counsel. Rather than rushing into a *Faretta* hearing, the first judge in the case, Judge Eckerle, wanted Swan to consult with his lawyer and think about his request. She thus said the issue could be raised again on the day trial began, at which point she would have a proper *Faretta* hearing.[6] Of course, Swan failed to raise the issue again. This demonstrates that he had abandoned his request.

This case is similar to *Brown v. Wainwright*, in which the trial court held a hearing on the defendant's motion to represent himself and, being reluctant to grant the motion out of concern that the defendant could not adequately represent himself, "deferred a ruling on the motion

and asked counsel to see whether the differences between him and his client could be worked out." 665 F.2d at 609. Though Swan tries to distinguish *Brown* by pointing out that a *Faretta* hearing was held in that case, the full panoply of *Faretta* requirements was not followed at the hearing, since the judge did not make a finding at the end. Nevertheless, because the defendant in *Brown* "did not indicate to the court or to counsel either formally or informally that he still desired to represent himself," *id.* at 609–10, and may have gone so far as to actually ask his counsel to continue the representation, *id.* at 611, the court concluded that the defendant abandoned or waived his request "through subsequent conduct after an initial request," *id.*

◼ Though *Brown* is not binding on this Court, it articulates a reasonable rule with regard to a defendant's waiver or abandonment of his request to proceed pro se or with hybrid counsel. This Court thus adopts the following rule from that case: "Even if [a] defendant requests to represent himself ... the right may be waived through [the] defendant's subsequent conduct indicating he is vacillating on the issue or has abandoned his request altogether." *Id.* at 611; *see also id.* ("A waiver may be found if it reasonably appears to the court that defendant has abandoned his initial request to represent himself.").

◼ While the right to represent oneself is a structural right, its invocation does not set into motion rigid, mechanical procedures that must be followed to the letter to avoid an error. The invocation of the right and whether the proper proce-

---

6. Swan's brief makes much ado over the judge's statement that it was "not exactly [his] right to serve as [his] own attorney," arguing that this demonstrates she did not understand the applicable law. But the judge was not incorrect, as the right is not absolute and its exercise requires a knowing, intelligent and voluntary waiver, as noted in the judge's next sentence. That she mentioned a *Faretta* hearing specifically shows that she understood and was applying the correct law.

dures were followed must be evaluated in the context of a given case. Otherwise, any hint of an invocation of the right, even if immediately withdrawn, would require a *Faretta* hearing. But the law does not require such empty process. Here, the first judge passed the issue, which placed the burden on Swan, as the person seeking to invoke the right, to raise it again at his next appearance.

More importantly, and despite Swan's claim otherwise, the change in judicial personnel just before trial has a large impact here and underscores that he abandoned his claim. Even assuming that the first judge's statement "we'll do that [i.e., raise the issue again and hold a *Faretta* hearing] the morning of trial" somehow bound her to raise the issue sua sponte when trial began, the appointment of a special judge necessarily returned the burden to Swan to pursue the issue. The special judge had no knowledge or reason to know of Swan's prior oral request to be co-counsel. As noted above, the *Faretta* duties with respect to the right to proceed pro se or with hybrid representation come into play only when the trial judge is informed that they are in issue by a defendant's request.

■ At best, the change in judges after the request was made resulted in confusion. But where a defendant's request to represent himself or have hybrid counsel is not acted upon because of confusion, there is no *Faretta* violation, especially where it appears that the defendant has abandoned his request once the dust settles. *Cf. People v. Kenner*, 223 Cal.App.3d 56, 59, 272 Cal.Rptr. 551 (Cal.Ct.App.1990) ("From this record, it is apparent that the motion was not acted upon due to the confusion caused by appellant's changing custody situation. Thus the case presents a stark judicial choice: who should bear the burden of the omission-the trial court or the mysteriously silent defendant? By urging that the judgment must be re-versed, appellant would absolve himself of any vestige of responsibility. That position is not justified by either the law or the facts.").

■ And, while the right is a structural right, it must still be applied in the real world, which sometimes requires a practical approach, not an absolute and unbending one. Rather than raising the issue again, Swan stood silent as the special judge started the trial. This Court holds that by doing so, Swan abandoned his request to proceed as co-counsel, which removed the need to hold a *Faretta* hearing, since such a hearing is required only in the face of an active request to so proceed. To hold otherwise would allow the fabrication of reversible error from the happenstance appointment of a special judge after a passed request to proceed pro se or with hybrid counsel. *See Kenner*, 223 Cal. App.3d at 62, 272 Cal.Rptr. 551 ("One interpretation of this record is that appellant realized that the trial court forgot the *Faretta* motion in the confusion resulting from his custody situation, and slyly saved his *Faretta* ace to play triumphantly on appeal. The record does not clearly establish any such cunning strategy; however, if it did, the gamesmanship should not be rewarded.").

Because Swan is deemed to have abandoned his otherwise timely and unequivocal request to proceed with hybrid counsel, the trial court did not err in failing to hold a *Faretta* hearing. Thus, Swan's rights to counsel, to proceed pro se, and to proceed with hybrid representation were not violated.

*2. The trial court did not err in allowing a witness to testify in the penalty phase after having been present in the courtroom, during guilt-phase testimony.*

■ Swan also complains that KRE 615 was violated when Brandon Lump-

kins's mother, Latonia, was allowed to testify in the penalty phase after she had been present in the courtroom during the guilt phase. Ms. Lumpkins was the first prosecution witness during the guilt phase. After her testimony, she remained in the courtroom and observed the trial. Prior to trial, Swan had requested the separation of witnesses under KRE 615.

While Swan is correct that a criminal defendant is entitled to the separation of witnesses upon request, *see* KRE 615, and that technically this separation extends from the guilt to the sentencing phases of a trial, he is incorrect that any resulting error requires reversal. As we recently noted, "Rule 615 has its roots in our pre-bifurcated trial system and thus its application to penalty phase witnesses may be somewhat outmoded." *McGuire v. Commonwealth*, 368 S.W.3d 100, 112 (Ky.2012) (footnote omitted). We also noted that applying the rule to the penalty phase "does nothing to serve the purpose behind the rule." *Id.* Thus, we stated, "trial courts should have the broadest possible latitude to permit family members of the victim and the defendant, who have heard the guilt phase proceedings, to testify during the penalty phase in mitigation of the penalty or as a victim opposing leniency." *Id.* The trial court therefore had the discretion to allow Ms. Lumpkins to testify during the penalty phase even though she heard much, and possibly all, of the guilt-phase testimony. *Id.* The nature of her penalty phase testimony was not such that it was unduly influenced by what she heard in the guilt phase, and thus there is no prejudice.

### 3. The trial court did not commit reversible error by evaluating the competency of a child witness in a short fashion and in the presence of the jury.

Finally, Swan complains that the trial court improperly evaluated the competen-cy of a child witness, the brother of Brandon Lumpkins. He objects both to the scope of the court's inquiry and the fact that it occurred in the presence of the jury.

The child was six years old at the time of the crimes, and eight years old at the time of the trial. When the child was called to testify, Swan moved to exclude the witness and for a competency hearing under KRE 601 because of the child's age at the time of the crimes. The court noted that the child was eight years old at the time he was to testify, said the motion was overruled (without saying which motion), and said, "We'll see." The child then took the stand and was sworn in the presence of the jury. The judge then proceeded to ask him a series of questions:

Court: Do you know what the difference is between right and wrong or telling the truth and not telling the truth?

Child: Uh-huh.

Court: Do you know what happens if you lie?

Child: Huh-uh.

Court: Get into trouble when you lie? Do you get into trouble when you lie?

Child: Uh-huh.

Court: So, are you going to lie here?

Child: Huh-uh.

Court: Tell the truth?

Child: Uh-huh.

Court: Try to keep your voice up, okay.

As the judge turned away from the witness, toward the lawyers' tables, he said, "The court is satisfied."

Swan first complains that the court's colloquy with the child was not a proper competency hearing "in any traditional understanding of that term." Though informally referred to as a hear-

ing, what the judge must do in deciding a witness's competency is better termed deciding a "preliminary question," which is controlled by KRE 104(a). That rule requires only that "[p]reliminary questions concerning the qualification of a person to be a witness ... shall be determined by the court." It imposes no requirements as to the content or length of the court's inquiry. In fact, it provides the judge with a great deal of discretion, since it obviates the requirements of the Rules of Evidence in making the determination. *See* KRE 104(a) ("In making its determination it is not bound by the rules of evidence except those with respect to privileges."). Simply put, an extensive formal hearing, at which both sides have the right to put on evidence and question all the witnesses, is not required for such a preliminary determination.

 The only real requirements on the competency determination appear in KRE 601(b), which lays out the minimal qualifications of a witness. The rule states:

A person is disqualified to testify as a witness if the trial court determines that he:

(1) Lacked the capacity to perceive accurately the matters about which he proposes to testify;

(2) Lacks the capacity to recollect facts;

(3) Lacks the capacity to express himself so as to be understood, either directly or through an interpreter; or

(4) Lacks the capacity to understand the obligation of a witness to tell the truth.

The rule "establishes a presumption of competency and allows disqualification of a witness 'only upon proof of incompetency.'" *Burton v. Commonwealth*, 300

S.W.3d 126, 142 (Ky.2009) (quoting *Price v. Commonwealth*, 31 S.W.3d 885, 891 (Ky. 2000)). Swan has not alleged, either at the trial court or on appeal, which of these requirements the child failed. His complaint is based solely on the child's age. But "[a]ge is not determinative of competency and there is no minimum age for testimonial capacity." *Pendleton v. Commonwealth*, 83 S.W.3d 522, 525 (Ky.2002). This is likely why the court denied the motion for a hearing almost summarily. Swan had failed to carry his burden to overcome the presumption of competency, having offered no proof other than the child's age.

 Still, the court did engage in at least a short inquiry that went to the requirements of the rule. And an issue with a child's competency is more likely to exist than with an adult. Thus, we will review the court's colloquy.

The court's questions to the child went to the fourth requirement, the capacity to understand the obligation to tell the truth, which is most often at issue with children. The court's questions were the bare minimum to establish whether the child understood being truthful, but are sufficient to establish this requirement, and do not indicate an abuse of discretion. The other major concerns with children are the first and second requirements, the capacity to perceive matters accurately and to recollect facts. But these were ultimately shown by the child's testimony about the events, which tracked that of the other witnesses. The fourth requirement, the capacity to express himself so as to be understood, is usually at issue only with much younger children. The boy's response to questions on the stand, while short and without additional exposition, showed this requirement was met.

 Ultimately, "[t]he trial court has the sound discretion to determine

whether a witness is competent to testify." *Pendleton,* 83 S.W.3d at 525. This Court cannot say that the trial court abused its discretion in finding this child to be a competent witness.

Swan also complains that the trial judge erred by examining the child and concluding that he was "satisfied" in front of the jury. The Rules of Evidence do not require that such examinations be out of the jury's hearing. *See* KRE 104(c) ("Hearings on other preliminary matters shall be so conducted when the interests of justice require, or when an accused is a witness and so requests."). While we have stated it is the "better practice to . . . conduct[ ] . . . . competency hearing in chambers, outside the presence and hearing of the jury," *Humphrey v. Commonwealth,* 962 S.W.2d 870, 874 (Ky.1998), we have never required it. Again, we cannot say the trial court abused its discretion.

 As to the court's statement it was "satisfied," Swan claims this bolstered the witness's testimony. This passing, single reference to being satisfied with the witness falls far short of the type of bolstering that would require reversal. To the extent it may have been error, we fail to see how it affected the verdict in this case and thus conclude it was harmless. *See* RCr 10.26; *Winstead v. Commonwealth,* 283 S.W.3d 678, 689 (Ky.2009) (holding that harmless error review looks at whether the judgment was substantially swayed by the error).

### C. Issues Raised by Owens

In addition to the issues he has in common with Swan, Owens raises three issues

independently. He claims that the trial court erred by failing to give an instruction on second-degree assault as a lesser-included offense, by failing to grant a directed verdict as to one of the wanton endangerment charges, and by allowing the prosecutor to argue to the jury that it should impose a sentence longer than that allowed by statute and by failing to specify the statutory maximum in the jury instructions.

### 1. Owens was entitled to an instruction on second-degree assault as a lesser-included offense.

 Owens first argues that his convictions for first-degree assault from the shootings [7] violated his due process rights because the trial court failed to give an instruction on second-degree assault as a lesser-included offense. Specifically, he argues that the jury could have believed that the assault victims in this case suffered only physical injuries, not severe physical injuries, which is one of the differences between the degrees of the offense. *Compare* KRS 508.010(1)(a) (describing first-degree assault in part as "intentionally caus[ing] *serious physical injury* to another person by means of a deadly weapon or a dangerous instrument" (emphasis added)), *with* KRS 508.020(1)(b) (describing second-degree assault in part as "intentionally caus[ing] *physical injury* to another person by means of a deadly weapon or a dangerous instrument" (emphasis added)).[8] Owens preserved this error by tendering an instruction on second-degree assault. *See* RCr 9.54(2).

---

**7.** Neither Swan nor Owens was charged with assault for their striking Brandon Lumpkins in the head and hand with a gun.

**8.** Owens does not claim that he was entitled to an instruction on second-degree assault under the theory of having intentionally

caused a serious physical injury without a deadly weapon or dangerous instrument, KRS 508.020(1)(a), or wantonly causing a serious physical injury with a deadly weapon or dangerous instrument, KRS 508.020(1)(c).

■■■■ As this Court has said on numerous occasions, "[i]n a criminal case, it is the duty of the trial judge to prepare and give instructions on the whole law of the case, and this rule requires instructions applicable to every state of the case deducible or supported to any extent by the testimony." *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky.1999); *see also* RCr 9.54(1). This duty as to instruction extends to lesser-included offenses. *Thomas v. Commonwealth*, 170 S.W.3d 343, 349 (Ky.2005). In fact, due process requires a proper instruction on a lesser-included offense because the instruction functions as a defense: "Although a lesser included offense is not a defense within the technical meaning of those terms as used in the penal code, it is, in fact and principle, a defense against the higher charge." *Slaven v. Commonwealth*, 962 S.W.2d 845, 856 (Ky.1997). That the jury convicted the defendant of the higher charge that was actually instructed on, rather than acquitting, does not change the matter.

■■■■ A lesser-included offense instruction, however, is not proper simply because a defendant requests it. "[A]n instruction on a lesser included offense is required *only if*, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that the defendant is guilty of the lesser offense." *Caudill v. Commonwealth*, 120 S.W.3d 635, 668 (Ky. 2003) (emphasis added). Or, as it has been described elsewhere, "to support a lesser included instruction the posture of the evidence must be such as to create a reasonable doubt as to whether the defendant is guilty of the higher or lower degree." *Tipton v. Commonwealth*, 640 S.W.2d 818, 820 (Ky.1982).

The question, then, is whether the jury could have found Owens not guilty of first-degree assault but guilty of second-degree assault. Framed as a question in terms of the crime's elements, if the jury could have found that he caused only physical injuries and not serious physical injuries, then he was entitled to the lesser-included offense instruction. The difference between the two degrees of the offense in this case is that one requires a physical injury and one requires a serious physical injury. A "physical injury" requires only "substantial physical pain or any impairment of physical condition" KRS 500.080(13), whereas a "serious physical injury" requires "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ," KRS 500.080(15). The type of injuries suffered depends on the proof at trial, which in this case was the testimony of the two victims.

Brandon Lumpkins testified that he was shot two times, once in the thigh of the left leg from the side and once in the ankle of the right leg. He also testified that the shot to his thigh left a scar and had hit his sciatic nerve. As a result he suffered pain daily and was unable to lift his foot. He admitted that the shot to his ankle left no lasting effect other than a scar. On the video record of the trial, when he walked over to show the jury the scar on his ankle, he appeared to limp slightly. He testified that he did not leave the house under his own power but was carried out on a stretcher and taken straight to the hospital. On cross-examination, he stated that he was given painkillers but admitted that he was released from the hospital after only "a couple of hours." He had a few follow-up doctor appointments after that but could not remember when the last one happened (though it had "been a while").

The second victim testified that he was shot in the thigh, with the bullet passing from the back to the front of the leg, which left a scar. He testified that right after the shooting, he could not walk without crutches. He too claimed that the bullet had injured his sciatic nerve, which still affected his foot and left him with a "slight limp." On the video, when he stepped down from the witness stand to point out some things on an exhibit, his limp was barely perceptible and appeared to be at most a very slight one. The second victim was able to crawl out of the house when Owens and Swan had fled out the back. He too was taken to the hospital and released later the same day. He testified that the medical staff recommended physical therapy, which he signed up for. On cross-examination he stated that he did some physical therapy but was no longer in therapy "due to financial reasons." His last medical appointment had been a year before.

■ Here, the Commonwealth's proof was far from compelling a finding of serious physical injury as required to avoid giving the lesser-included offense instruction. That the victims in this case suffered at least physical injuries is undeniable. *Luttrell v. Commonwealth,* 554 S.W.2d 75, 78 (Ky.1977) ("One cannot be shot ... without being physically injured or without use of a deadly weapon."). Whether the nature of the evidence was such that the jury was compelled instead to find only the existence of serious physical injury is not so clear, as not all gunshot wounds are serious physical injuries. *Id.* at 79 (holding that officer who was shot in the chest with birdshot and whose wounds were therefore superficial "suffered from his wounds [but] was not seriously injured in

the statutory sense").[9] We permit a trial court to not instruct on lesser-included offenses only where the evidence presents an all-or-nothing proposition, allowing only a single account of the degree of the offense *or* demanding an acquittal. *See, e.g., Cecil v. Commonwealth,* 888 S.W.2d 669, 674 (Ky.1994) (holding that evidence was overwhelmingly in support of intentional or aggravatedly wanton behavior when defendant shot victim at point blank range, even though defendant claimed the gun just "went off"); *Crane v. Commonwealth,* 833 S.W.2d 813, 817 (Ky.1992) (holding that "circumstances belie[d] and preclude[d] any inference of mere wanton or reckless conduct on the part of the robber-killer").

The proof here simply does not establish such an all-or-nothing proposition. The jury had a chance to see both victims as they walked through the courtroom. This allowed them to evaluate whether each suffered a limp, as claimed in their testimony, and possibly whether any limps were faked or exaggerated. Having reviewed the record, the jury could have reasonably believed that the victims' physical behavior belied their claims to suffering continued disability from the shooting.

■ Moreover, the only overt proof about the injuries offered to the jury was the victims' testimony. No medical proof, either by testimony or medical records, was offered. While "medical testimony is not an absolute requisite to establish serious physical injury or even physical injury," and a "victim [i]s competent to testify about his own injuries," *Commonwealth v. Hocker,* 865 S.W.2d 323, 325 (Ky.1993), medical proof can certainly clinch the case for the Commonwealth. Even if medical

---

9. While Owens has not claimed he was entitled to a directed verdict, it is worth noting that the evidence was at least *sufficient* to support a finding of serious physical injury (and thus avoid a directed verdict).

proof is not necessary, the requirement of "serious physical injury" for first-degree assault still "sets a fairly strict level of proof." *Prince v. Commonwealth*, 576 S.W.2d 244, 246 (Ky.App.1978), *cited with approval in Commonwealth v. Hocker*, 865 S.W.2d 323, 325 (Ky.1993).

The jury could have reasonably believed from the victims' descriptions of their injuries that they suffered substantial physical pain or an impairment of a physical condition. At the same time, the jury could have believed that the victims were *not* subjected to a substantial risk of death, and that they did not suffer from serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ. That would have allowed the jury to find Owens guilty of only second-degree assault. Of course, the jury could also have found that the injuries did rise to the level of serious physical injury. The evidence established injuries that fell somewhere in the gray area between mere physical injury and serious physical injury. The decision as to which type of injury actually occurred required close observation of the victims' behavior, attention to their testimony, and overall interpretation of the evidence. That function could only be carried out by the jury, not the judge.

Where the evidence would support a finding of different degrees of a crime, "the trial court usurp[s] the role of the jury in determining that the evidence did not support a [lesser-included offense] instruction." *Parker v. Commonwealth*, 241 S.W.3d 805, 811 (Ky.2007). In light of the proof offered in this case, it is entirely *possible* and reasonable that the jury could have found that the victims suffered either from physical injuries or serious physical injuries. This required an instruction on the lesser-included offense of second-degree assault. *See id.* ("When the evidence is subject to different interpretations by the jury, even though the trial court might believe it unlikely that the jury could find the requisite state of mind for a lesser included offense, it is nonetheless required to instruct on the lesser-included offense if such an interpretation is *possible* ").

Owens's convictions for first-degree assault must, therefore, be reversed. He is, however, subject to retrial on those counts, should the Commonwealth wish to proceed on the charges again. This reversal, however, has no effect on his overall sentence, as the court, when reducing the overall sentence to conform to the statutory cap, ran the sentences for these offenses concurrently with the others.[10]

## 2. The trial erred in failing to grant a directed verdict on the charge of first-degree wanton endangerment of Latonia Lumpkins.

Owens claims that the trial court should have granted a directed verdict on the first-degree wanton-endangerment charge related to Latonia Lumpkins. At the close of the proof, Owens's trial counsel specifically moved for a directed verdict on this charge.

When confronted with a motion for a directed verdict, "the trial court

---

10. Swan was convicted of two counts of first-degree assault also. Had he raised the same argument, the proof suggests that he too would have been entitled to a reversal for lack of lesser-included offense instructions. But he did not raise this issue on appeal, and this Court is not inclined to address it sua sponte. Even assuming that the palpable error rule, RCr 10.26, would allow us to address an issue not raised on appeal, Swan has not been subjected to the manifest injustice required by that rule, since his sentence would not change even if his assault convictions were reversed.

must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth" and "assume that the evidence for the Commonwealth is true, but reserv[e] to the jury questions as to the credibility and weight to be given to such testimony." *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991). "If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given." On appellate review, "the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt." *Id.* If the answer is yes, "then the defendant is entitled to a directed verdict of acquittal." *Id.*

The charge in question is a violation of KRS 508.060, which makes it a crime "under circumstances manifesting extreme indifference to the value of human life, [to] wantonly engage[ ] in conduct which creates a substantial danger of death or serious physical injury to another person." KRS 508.060(1). As the commentary to the statute notes,

> The offenses created by KRS 508.060 and 508.070 can best be described by use of this hypothetical situation: D, with no intent to kill or injure but with an awareness of the risk involved, shoots a gun into an occupied building, thereby consciously disregarding the risk of death or injury to its occupants. . . . If D's act causes neither [death nor physical injury], he has committed the offense of wanton endangerment. . . .

> . . . The types of conduct indicating such character and punishable under these two statutes are such things as discharging firearms in public, pointing firearms at others, obstructing public highways, and abandoning containers which are attractive to children.

KRS 508.060 Kentucky Crime Commission/LRC Commentary (1974).

■ The differences between first- and second-degree wanton endangerment are the mental state and degree of danger created. As to the mental state, both crimes require wanton behavior, but first-degree also requires "circumstances manifesting extreme indifference to the value of human life," which has been described as "aggravated wantoness." *E.g., Ramsey v. Commonwealth,* 157 S.W.3d 194, 197 (Ky. 2005). As to the danger created, first-degree requires a substantial danger of death or serious physical injury, whereas second-degree requires only a substantial danger of physical injury. The distinction between the two degrees of the crime was described in the commentary in part as follows:

> Creation of the two offenses is necessitated by the wide differences in dangerousness that exist with the various types of wanton conduct. For example, aimlessly firing a gun in public is not as wanton in degree as firing a gun into an occupied automobile and should not carry the same criminal sanction.

KRS 508.060 Kentucky Crime Commission/LRC Commentary (1974). In the examples given, aimlessly firing a gun in public would be the second-degree crime and firing a gun into an occupied car would be the first-degree crime. Or, as described by Professors Lawson and Fortune, "Firing a weapon in the immediate vicinity of others is the prototype of first degree wanton endangerment. This would include the firing of weapons into occupied vehicles or buildings." Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* § 9–4(b)(2), at 388 n. 142 (1998) (citations omitted). Thus, the proof of Owens and Swan firing their guns near the victims assembled in the living room was

ample proof to support the first-degree convictions related to those victims.

Ms. Lumpkins, however, presents a more difficult question. The offense alleged to have been committed against her does not fit clearly with the quintessential examples of first-degree wanton endangerment. She was not in the immediate vicinity of those fired shots. *Cf. Combs v. Commonwealth,* 652 S.W.2d 859, 860 (Ky. 1983) (firing a gun "right beside" a victim, "point blank" at another, and shooting within 15 feet were first-degree wanton endangerment). And Owens and Swan were not firing blindly into an occupied house, such as through a locked door. *Cf. Paulley v. Commonwealth,* 323 S.W.3d 715, 724 (Ky.2010) (firing a gun through a door was first-degree). Instead, they were in the house firing their guns with at least some of their victims in plain view.

This is not to say that only these behaviors—firing a gun very near another person or into an occupied car or house—will constitute the first-degree version of the crime. Rather, they are simply clear examples of behavior that is sufficient to constitute the crime and not examples of necessary behavior. They are examples of the severe enough behavior that other behaviors must approach to be first-degree wanton endangerment. The question, then, is whether Owens acted with the requisite mental state and created a sufficient danger with respect to Ms. Lumpkins when he fired his gun in the living room of the house.

Ms. Lumpkins was in the back bedroom of the house the entire time that Owens and Swan were robbing and terrorizing the other occupants. All five of the shots—the three that resulted in assaults on two of the victims, the one into the ceiling, and the one into the fireplace—were fired in the living room, which was down the hall from the back bedroom. No evidence showed that a bullet was fired in Ms. Lumpkins's direction or that Owens pointed a gun at her. And unlike the victims in the front room, Ms. Lumpkins was not present when Owens and his confederate were waving their guns around haphazardly and making threats.

Even when viewing the evidence in a light most favorable to the Commonwealth, it is difficult to conceive of an actual danger of death or serious physical injury to which Ms. Lumpkins was exposed. The Commonwealth posits that a bullet could have ricocheted and harmed Ms. Lumpkins, which was sufficient to create the danger necessary to constitute the crime. Admittedly, we have stated that "[i]t is self-evident that bullets may ricochet," *Hunt v. Commonwealth,* 304 S.W.3d 15, 38 (Ky.2009), but the danger from ricochets is not endless. In *Hunt,* the endangered victim, a child in a bassinet, was within a few feet of the shots fired in that case. Ms. Lumpkins, on the other hand, was on the other side of the house, understandably hiding under a bed.

The self-evident danger of ricocheting bullets must have limits, but the Commonwealth's approach to the crime in this case offers none. Like the danger of ricochets, it is also well-known that bullets can go through and endanger people beyond the walls of a structure. So if Ms. Lumpkins was subjected to first-degree wanton endangerment, then were not the Officers, who were present just outside the house when some of the shots were fired, also subjected to the same crime? What about neighbors in nearby houses? Or those down the street? We must draw the line somewhere.

The Commonwealth notes that Ms. Lumpkins stepped out of the bedroom momentarily and saw the assailants down the hallway. This, the Commonwealth argues, provided a clear line of sight between Ms.

Lumpkins and the shooters, which sufficiently endangered her. Being in the line of sight, by itself, is still insufficient. Again, no shots were fired in her immediate vicinity or in her direction. Moreover, she was only in the hallway for a few seconds before she stepped back into the bedroom and hid.

The Commonwealth also points to the fact that Owens and possibly Swan entered the bedroom where Ms. Lumpkins was hiding. While the jury could infer they were armed at that time, Brandon Lumpkins testified at one point that Owens left his gun with Swan when he went through the rest of the house. More importantly, there is no proof or reasonable inference that shows that either Swan or Owens pointed a gun at Ms. Lumpkins or fired a shot near her when they went into her room. Merely being in the presence of guns, even when wielded by persons who are intent on harming and terrorizing, is not sufficient by itself to create a wanton-endangerment crime.

In light of the proof in this case, and a proper reading of the first-degree wanton-endangerment statute, this Court concludes that no reasonable jury could have found that Ms. Lumpkins was exposed to the level of danger required to constitute the crime of first-degree wanton endangerment. The trial court should have granted a directed verdict on Owens's first-degree wanton-endangerment charge relating to Ms. Lumpkins.[11] Though Owens is not subject to retrial for this offense, since this reversal functions as an acquittal, this reversal, like the reversal above of his assault convictions, has no effect on his overall sentence, as the court, when reducing

the overall sentence to conform to the statutory cap, ran the sentences for this offense concurrently with the others.

### 3. No reversible error occurred in the sentencing phase.

Finally, Owens claims that the trial court erred in allowing the prosecutor to present proof that the maximum sentence Owens faced was greater than that allowed by statute, in allowing the prosecutor to argue in an inflammatory manner to convince the jury to give more than the statutory maximum, and in failing to properly instruct the jury about the statutory maximum.

During the proof portion of the sentencing phase, the prosecutor engaged in the following line of questioning of a probation and parole officer:

Prosecutor: So for both of the defendants, the most possible amount of years would be 165? Does that sound right to you?

Officer: I will defer to your math skills. The maximum is 70, statutorily.

Prosecutor: Right, right. But if we weren't prevented, they could be looking at that.

Officer: That's right.

Prosecutor: If they ran them all concurrent, what's the minimum sentence that both could receive?

Officer: It would be ten years.

Prosecutor: But regarding Owens. Owens has an additional Class C felony, is that right?

Officer: Correct.

Prosecutor: So he could get another five to ten years?

---

11. Again, Swan was convicted of the same crime. Had he raised the same argument, the proof suggests that he too would have been entitled to a directed verdict. But he did not raise this issue on appeal, and Swan has not been subjected to the manifest injustice required by the palpable error rule, RCr 10.26, since his sentence would not change even if his wanton-endangerment conviction were reversed.

Officer: Correct.

Prosecutor: Okay. So his maximum, his maximum would be 175 years?

At that point, Owens's counsel objected. At the ensuing bench conference, she noted that the law is clear that even though the statutory cap on consecutive sentences is 70 years, the prosecutor kept talking about "if there weren't a cap." She also complained presciently that she thought the prosecutor intended to craft an argument based on the number of years the defendants could get if there were not a cap, which she claimed was improper. The court responded that it was appropriate to explain to the jury, which was made up of lay people, what they were dealing with and gave the prosecutor latitude. The prosecutor then returned to questioning the probation and parole officer, turning to the issue of parole eligibility if Owens and Swan were given the maximum of 70 years.

Later, during his closing argument, the prosecutor made repeated comments about the consecutive sentences being capped at 70 years. Near the beginning of his argument, he said, "I am going to ask for 70 years. And the only reason I'm only asking for 70 is because I can't ask you to give them more." At another time, he said, "Punishment should fit the crime. Now, as I said and will continue to say, 70 years does not fit the crime, but that's all I can ask." Later still, he said that Mr. Owens's "past conduct, all that tells you is he deserves more than 70. That's all that tells you, that he deserves more than 70. It does not tell you he deserves less than 70. They both deserve the maximum amount of time." Defense counsel, however, did not object during these parts of the closing argument.

When the court instructed the jury, it included the following general instruction: "The total number of years recommended by the Jury shall not exceed seventy (70) years, the statutory limit." The jury verdict form, however, included no mention of the statutory maximum. Owens does not cite anywhere in the record where he tendered a verdict form mentioning the maximum or objected to the instructions as given.

The jury's verdict recommended the maximum for each count. In the part of the verdict form addressing whether the sentences were to run consecutively or concurrently, the jury chose the consecutively option, and below that, where asked which counts should run consecutively, listed all fifteen of Owens's counts. Despite an implication otherwise in Owens's brief, the jury did not list a number that these consecutive sentences would add up to. As the judge read the verdicts, he started with Swan's, whose charges the jury also recommended all run consecutively. He noted that running all of the charges consecutively would exceed the 70–year cap. He then asked the jury whether that was their "feeling" and "verdict." The foreman answered, "Yes, that is what we decided. We assumed that the court would then reduce it down to 70. We could do that with a calculator if you want us to." The judge declined and said he would accept the verdict. He then turned to read Owens's verdict. The judge did not ask the jury again about the verdict exceeding the statutory cap, though he did note, "As the jurors know, I will reduce that to 70 years in the penitentiary when the final judgment is entered."

Of the three related claims that Owens raises about the sentencing phase, only the first complaint about the prosecutor's questioning of the probation and parole officer is preserved for review. Technically speaking, then, the other complaints, that the prosecutor's argument inflamed the jury and urged it to give an

excessive sentence and that the jury instructions were flawed, are subject at most to palpable error review.

 The first two claimed errors are easiest addressed together. Owens does not allege that the probation and parole officer or the prosecutor misled the jury about the statutory cap. Indeed, the record clearly shows that the officer went to great pains, even answering the prosecutor's question non-responsively, to clarify that the statutory cap was 70 years. The prosecutor continually qualified his own argument with that same information. Admittedly, the prosecutor's approach to the argument—to repeatedly urge the jury to give the defendant the maximum because he deserved more and, absent the cap, could get more—is discomfiting. While prosecutors are given wide latitude in closing arguments, their arguments should nevertheless stay within the bounds of and demonstrate respect for the law. Here, the prosecutor essentially described the law as an impediment to the jury's ability to do the right thing. Such argument borders on improper, and the prosecutors of this Commonwealth are admonished to avoid such arguments in the future.

Still, we cannot say that the objected-to line of questioning during the sentencing testimony prejudiced Owens, especially when the prosecutor's own witness correctly described the statutory cap. And we cannot say that the unobjected-to parts of the prosecutor's argument, while troubling, rose to the level of manifest injustice and thus palpable error.

 As to the jury instructions, we see no error at all. The scant authority Owens's counsel cites on this point—*Allen v. Commonwealth*, 276 S.W.3d 768 (Ky.2008) and, inappropriately,[12] an unpublished decision—are wholly inapplicable. While *Allen* declares that a court errs when it fails to instruct the jury on the relevant statutory sentencing cap, the court in this case clearly *did* instruct the jury on the cap. While it may be the better practice to include on the verdict form the qualification that the jury's sentence may not exceed the statutory cap, the instructions in this case were legally sufficient.

 Finally, Owens implies that the jury's verdict was improper because it nevertheless exceeded the statutory cap. First, it is not clear that the verdict actually exceeded the statutory cap. The jury simply asked that all the sentences be run consecutively and did not include a total number of years. Second, even assuming such a verdict technically violates the statutory cap, it is clear that Owens was not prejudiced. When asked about this part of the verdict, the foreperson explained that the jury understood the 70–year cap and assumed the court would take care of it. It serves little more than over technicality to require the jury calculate exactly which sentences will add up to 70 years when their preference for that maximum allowable sentence is unmistakably expressed, as it was in this case.

### III. Conclusion

For the forgoing reasons, Swan's convictions and sentence are affirmed in their entirety.

---

12. Lest the bar think this is unduly harsh, it is worth noting that unpublished opinions may only be cited under CR 76.28(4), which limits citation to such opinions to situations where "there is no published opinion that would adequately address the issue before the court." The published *Allen* decision that Owens's counsel cites handles the issue in exactly the same way as the unpublished decision. Because there is published authority exactly on point, it was unnecessary and improper to cite the unpublished decision.

Owens's convictions for first-degree assault and first-degree wanton endangerment of Latonia Lumpkins are reversed. His other convictions and overall sentence are affirmed. His case is remanded to the trial court for correction of his judgment and any further proceedings in accordance with this opinion.

All sitting. MINTON, C.J.; ABRAMSON and VENTERS, JJ., concur. CUNNINGHAM, J., concurs in result by separate opinion in which SCOTT, J., joins. SCHRODER, J., concurs in part and dissents in part by separate opinion.

CUNNINGHAM, J., Concurring in Result:

I applaud the excellent work in the majority opinion.

I respectfully disagree, however, that the prosecutor's closing argument at sentencing was improper. The Commonwealth's Attorney was seeking the maximum penalty for these terribly violent and reprehensible crimes. The penalty was capped under the statute to 70 years. The jury could have given less. As an argument to obtain the maximum sentence of 70 years, the prosecutor simply pointed out that, if the penalty was not capped, the defendants would be subject to a much greater sentence—165 years, in fact. "If we weren't prevented," the prosecutor truthfully pronounced, "they could be looking at that."

It is clear to me that in essence the Commonwealth is trying to make clear that the law has already given the defendants the only break they deserve. Therefore, the state's attorney insists, be sure and give them the maximum.

Quite frankly, I think it is a very good point in a sentencing argument. And I see nothing wrong with the Commonwealth's Attorney wishing that the jury could give them more in an attempt to persuade the jury to give the defendants the maximum allowed by law.

To my way of thinking, it is simply a good argument for a severe sentence in a case which deserves a severe sentence. I strongly disagree with the majority on this point. However, I readily concur to the rest of a very fine opinion.

SCOTT, J., joins.

SCHRODER, J., Concurring in Part and Dissenting in Part:

I do not believe that the trial court erred in denying Owens' motion for a directed verdict on the charge of first-degree wanton endangerment of Latonia Lumpkins. I would therefore affirm Owens' conviction on that count. Otherwise, I fully concur in the majority opinion.