# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: FEBRUARY 20, 2020
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-000328-MR

FINAL

GARY JOSHUA MILLS                 APPELLANT

DATE 3/12/20

V.        ON APPEAL FROM BELL CIRCUIT COURT
HONORABLE ROBERT V. COSTANZO, JUDGE
NO. 16-CR-00529, 16-CR-00530, 16-CR-00549, AND 17-CR-00123

COMMONWEALTH OF KENTUCKY               APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Gary Joshua "Josh" Mills was convicted in Bell County Circuit Court of one count of first-degree robbery; two counts of theft by unlawful taking, value $500 or more; one count of second-degree burglary; one count of first-degree fleeing or evading police; and one count of first-degree wanton endangerment. He was also found to be a second-degree persistent felony offender. He was sentenced to a total of twenty years and this appeal followed.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Josh Mills' crime spree began in the early morning hours of December 6, 2015. Around 3 a.m. Mills stole a 2006 Chevy Malibu belonging to Michelle Hensley from a gas station in Bell County. Then, he drove the Malibu to

Harlan County and abandoned it. Mills proceeded to steal a Ford Mustang from the same location that he abandoned the Malibu.[1]

After Mills stole the Mustang from Harlan County, he began driving back towards Bell County on State Highway 119. By that time, Kentucky State Police Trooper Chris Pruitt was notified about the stolen Mustang and directed to be on the lookout for it. Tpr. Pruitt testified he was in Bell County when he received the call and thereafter began driving towards Harlan County on Highway 119. Shortly after, he noticed a Mustang fitting the description he was given driving towards Bell County at a high rate of speed. Tpr. Pruitt turned around and caught up to the Mustang. He attempted to pull Mills over, but he fled. Tpr. Pruitt was forced to exceed 100 mph at times to keep up with him.

Soon after the chase began, Mills turned off Highway 119 and on to Highway 1534. Highway 1534 is a secondary roadway in Bell County that is extremely curvy and narrow at certain points. Tpr. Pruitt testified that he drove as quickly as he could on such a road, but nonetheless lost sight of Mills in several curves. During a time when Tpr. Pruitt lost sight of Mills, Mills made a left turn onto E.W. Miracle Road. Tpr. Pruitt continued driving on Highway 1534 believing Mills was still on it; he was never able to apprehend Mills.

E.W. Miracle Road is a dead-end residential road. Mills drove the Mustang to the end of the road and, realizing it was a dead-end, attempted to

---

[1] Because the Mustang was stolen from Harlan County, its theft is not at issue in this case.

2

turn the car around in Deena Miracle's yard. Unbeknownst to Mills, Ms. Miracle had several railroad ties in her yard marking the spot where her septic tank was buried. Mills backed directly over these ties, causing the Mustang to become stuck. Security camera footage from Ms. Miracle's home showed Mills then abandoning the Mustang and attempting to open her vehicle, which was parked in her driveway. When he discovered it was locked, he began walking down Ms. Miracle's driveway towards Iva[2] Sutton's home.

Ms. Sutton was, at that time, a seventy-nine-year-old widow of ill health who lived alone. She testified that she was sitting in her living room when she heard her doorbell ring. She got up and went to her front door but saw no one. As she began walking back towards her living room, she was accosted by Mills in the hallway that connected the front of her home to her living room. He entered the home by breaking the window frame out of her backdoor, which was in the living room.

Ms. Sutton asked Mills who he was, and he said, "ma'am, give me your keys, I promise I won't hurt you." Her purse, which contained her car keys, was on a bed in a bedroom off the hallway. The bedroom was very small, and it was a tight squeeze to get in and out of it. Ms. Sutton therefore had to completely enter the room in order to reach her purse. She had her left arm on the door as she entered the room and Mills, presumably thinking she was going to try to lock herself in the room, pushed the door in on her hard. This caused

_____

[2] Mills' appellate brief incorrectly identifies Ms. Sutton as "Ida."

an abrasion to her left forearm. Ms. Sutton then retrieved her purse and gave it to Mills. Afterwards, Mills was recorded by Ms. Sutton's security cameras as he stole her 2004 Chevrolet Impala.

After stealing Ms. Sutton's Impala, Mills drove the car to Mountain Drive in Bell County and abandoned the vehicle. Shortly after abandoning the Impala, Mills called his estranged wife, Natalie. During that phone call, Mills told her he was on foot on Mountain Drive running from the police, that he just wrecked a vehicle he stole, and that he stole four or five cars the night before. He also told her his plan was to have the police shoot him. Natalie implored him to turn himself in, but he refused. When the call ended, Natalie first called Mills' mother and told her everything Mills just told her. Then Natalie called 911 and told the operator about her conversation with Mills and where he could be found.

However, by the time the police, Natalie, and Mills' parents arrived on Mountain Drive, he was gone. After abandoning Ms. Sutton's Impala, he allegedly walked to Pitman's Creek Road to the home of David Deitsch and stole Mr. Deitsch's 2002 Jeep Wrangler.[3] Mr. Deitsch testified that you can get to the road he lives on by going down a hill off Mountain Drive. Mr. Deitsch and his family were at church when the Jeep was stolen. But his neighbor testified that she heard his dogs barking, which alarmed her because she knew he was

---

[3] Mills was found not guilty of stealing Mr. Deitsch's Jeep, but because we must address issues related to this charge, we note this component of the Commonwealth's case in chief.

4

at church. When she then saw the Jeep driving in the opposite direction that Mr. Deitsch would go if he was going to church, she called the police. After taking the Jeep, Mills drove it to Short Branch Road in Bell County and abandoned the Jeep in a densely wooded area. The Jeep was not found until eight days later on December 14th.

After abandoning the Jeep on Short Branch Road, Mills walked to Charles Calebs' home on Charlie Thompson Lane. Charlie Thompson Lane branches off from Short Branch Road, and both are west of State Highway 92 in Bell County. Mr. Calebs' security camera footage showed Mills breaking into his home and immediately picking up one of the security cameras and cutting its power cable. Mills then cut the cables of the three other cameras in the home. Mills also cut the power cable to the entire security system, as well as the home's internet cable. Mr. Calebs testified that his medicine cabinet was opened, but was already empty before the break-in. However, Mills did take two change jars that were later found in the yard by Mr. Calebs' pump house for his well water system.

Two days later, on December 8th, Kentucky State Trooper Kelly Farris was on duty in Knox County. He observed a side by side all-terrain vehicle driving at a high rate of speed on a main road. Tpr. Farris was able to stop the ATV and arrest the driver, who turned out to be Mills. Tpr. Farris testified that Mills said to him, "the only vehicles [I] stole had keys in them."

Additional facts are discussed below as necessary.

## II. ANALYSIS

### A. The trial court erred by allowing Mills' ex-wife to testify, however it was harmless error.

Mills' first argument is that the trial court erred by allowing Natalie to testify about the phone conversation the two had during Mills' spree. Specifically, he asserts that Natalie should have been barred by the marital communications privilege of Kentucky Rule of Evidence (KRE) 504 from testifying about the content of the phone call.[4]

KRE 504, has three components: subsection (a), which codifies a spousal testimonial privilege; subsection (b), which provides a confidential marital communications privilege; and subsection (c), which delineates several exceptions to parts (a) and (b). The testimonial privilege protected by KRE 504(a) ends when the marriage is dissolved, while the confidential communications privilege of KRE 504(b), if applicable, survives divorce.[5]

Natalie and Mills were still legally married when Mills committed these crimes, though Natalie filed for divorce nine months earlier in March 2015. Their divorce was finalized in May 2016, over a year before the trial in July 2017.

---

[4] This argument was preserved by Mills' pre-trial motion to invoke the spousal privilege. *St. Clair v. Commonwealth*, 451 S.W.3d 597, 639 (Ky. 2014) ("[T]he marital-communications privilege under KRE 504 must be invoked before it can be applicable.").

[5] *See Winstead v. Commonwealth*, 327 S.W.3d 386, 391-92 (Ky. 2010).

Accordingly, the only part of KRE 504 in play here is subsection (b), because it survives divorce. KRE 504(b) provides that

> [a]n individual has a privilege...to prevent another from testifying to any confidential communication made by the individual to his or her spouse during their marriage. The privilege may be asserted only by the individual holding the privilege or by the holder's guardian, conservator, or personal representative. **A communication is confidential if it is made privately by an individual to his or her spouse and is not intended for disclosure to any other person.**

(emphasis added). "'Confidential,' in the context of the marital communication privilege, does not include communications made within the hearing or presence of another person, or which could have been observed by another person."[6] Therefore, "[w]hen information gained by the spouse involves acts, occurrences, or verbal exchanges which may have been known or seen by any person, the privilege under the statute does not apply."[7]

Consequently, the first step of our analysis in this case is to determine whether the statements Mills complains of were in fact confidential. The specific statements by Mills to Natalie that he argues should have been suppressed were the following: that he was on Mountain Drive; that he just wrecked a vehicle he stole; that he was on foot; that he stole four or five cars the night before; that he was running from police; and that his plan was to have the police shoot him.

---

[6] *White v. Commonwealth*, 132 S.W.3d 877, 882 (Ky. App. 2003).

[7] *Wadlington v. Sextet Mining Co.*, 878 S.W.2d 814, 817-18 (Ky. App. 1994).

As previously discussed, all of these statements were made during a private phone call between Mills and Natalie. There was no evidence to suggest that anyone else overheard the phone call or was present when it occurred. Therefore, all of the statements qualified as confidential, and it was error for the trial court to allow them into evidence.[8]

Nevertheless, "[p]reserved evidentiary and other non-constitutional errors will be deemed harmless...if we can say with fair assurance that the judgment was not substantially swayed by the error."[9] Here, the amount of evidence presented against Mills, the fact that he was acquitted of the theft of Mr. Deitsch's jeep, and the fact that the jury sentenced him to the minimum possible sentence convinces this Court that the error was harmless.[10]

## B. The trial court did not err by allowing evidence of the shotgun found in Mr. Deitsch's Jeep.

When Mr. Deitsch's Jeep was recovered by police and returned to him, he discovered that several items were left in the vehicle that did not belong to him. Mr. Deitsch therefore turned those items into the Bell County Sheriff's Department. Sargent Jerry Smith testified that those items were the following: several items of clothing and a beach towel that were found in a hot/cold bag;

---

[8] *See St. Clair v. Commonwealth*, 174 S.W.3d 474, 480 (Ky. 2005) (holding that defendant's statements to his wife during a private phone conversation were confidential and therefore inadmissible).

[9] *Meece v. Commonwealth*, 348 SW3d 627, 645 (Ky. 2011); Kentucky Rule of Criminal Procedure (RCr) 9.24.

[10] The Commonwealth also advocates for this Court to adopt a "bum marriage rule." This rule would provide an exception to KRE 504(b) when the marriage is not factually valid at the time of the communication. Because we find the error in this case to be harmless, we decline to address that argument at this time.

a red flashlight; a black leather knife sheath and whetstone; and a .410-gauge shotgun. Natalie subsequently testified that one of the items of clothing belonged to Mills; she did not testify that any of the other items belonged to him. Apart from Sgt. Smith and Natalie's testimony, there was no other evidence regarding any other items found in the Jeep.

Mills asserts that it was error to allow Sgt. Smith to say that a shotgun was found in the Jeep.[11] Specifically, he alleges the trial court erred by finding that the probative value of the shotgun was not substantially outweighed by its potentially prejudicial effect in violation of KRE 403.[12]

"A determination by the trial court that the probative value of the evidence is not outweighed by the prejudice, if any, is reviewed for an abuse of discretion."[13] A trial court abuses its discretion when it acts arbitrarily, unreasonably, unfairly, or in a legally unsound way.[14]

All relevant evidence is admissible, unless otherwise provided by law.[15] Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more

---

[11] This alleged error was properly preserved by Mills' objection about the shotgun evidence at trial. RCr 9.22 ("It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which that party desires the court to take or any objection to the action of the court, and on request of the court, the grounds therefor[.]").

[12] "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice[.]" KRE 403.

[13] *Little v. Commonwealth,* 272 S.W.3d 180, 187 (Ky. 2008).

[14] *English,* 993 S.W.2d at 945.

[15] KRE 402.

probable or less probable than it would be without the evidence."[16] And, "only a slight increase in probability must be shown" in order to pass the test for relevance.[17]

Here, Mills argues that evidence of a shotgun being found in the Jeep was neither relative nor probative because no one testified that it belonged to him. But, on the other hand, it was highly prejudicial because it suggested he committed all his crimes while in possession of a shotgun. We disagree. Instead, we agree with the Commonwealth's position that the shotgun evidence was relevant, had probative value, and that probative value was not substantially outweighed by any potential prejudicial effect.

Mills was charged with stealing Mr. Deitsch's Jeep. When Mr. Deitsch got his Jeep back from law enforcement there were items in it that did not belong to him. Those items, one of which happened to be a shotgun, demonstrated that someone other than Mr. Deitsch was in the Jeep at some point. Therefore, its probative value was to demonstrate that someone else had in fact been inside Mr. Deitsch's Jeep; and, likely, whoever was in the Jeep was the person that stole it.

The shotgun's relevance and probative value established, we must next weigh that probative value against any danger of undue prejudice it could have created. Evidence is unduly prejudicial "if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the

---

[16] KRE 401.
[17] *Little*, 272 S.W.3d at 187.

10

evidence presented."[18] As previously mentioned, Sgt. Smith's testimony about the items found in the Jeep was the *only* time the shotgun was mentioned. The Commonwealth never discussed it or suggested that Mills committed any of these crimes while possessing a shotgun. The Commonwealth was clear from the beginning that it never intended to elicit testimony that the shotgun belonged to Mills. Its only purpose in presenting the evidence of the items found in the Jeep was to demonstrate that someone other than Mr. Deitsch was in it. We therefore hold that the trial court did not abuse its discretion by allowing this evidence.

Finally, and most significantly, Mills was ultimately found not guilty of stealing Mr. Deitsch's Jeep. Therefore, even if the trial court did err by allowing evidence of the shotgun, it clearly was not reversible error as Mills suffered no prejudice due to its admission.[19]

## C. **Mills' convictions for first-degree robbery and theft by unlawful taking did not violate his double jeopardy rights.**

Mills next claims that his convictions for the first-degree robbery of Ms. Sutton and theft by unlawful taking of Ms. Sutton's vehicle violated his rights

---

[18] *Brown v. Commonwealth,* 313 S.W.3d 577, 619 (Ky. 2010).

[19] "No error in either the admission or the exclusion of evidence...is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice." RCr 9.24.

against double jeopardy.[20] Appellate courts review issues related to the double jeopardy clause *de novo*.[21]

"The Double Jeopardy Clause, of course, affords a defendant three basic protections: It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense."[22] In this case, Mills is invoking the double jeopardy clause's protection from multiple punishments for the same crime.

The Supreme Court of the United States' seminal case for this area of double jeopardy jurisprudence is *Blockburger v. U.S.*.[23] In *Blockburger*, the Supreme Court held that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."[24] Kentucky has since fully adopted the *Blockburger* approach. Under our case law "[d]ouble jeopardy does not occur when a person is charged with two crimes arising from the same course

---

[20] This alleged error was preserved by Mills' objection to submitting instructions on first-degree robbery and theft by unlawful taking to the jury on double jeopardy grounds. *See Cardine v. Commonwealth*, 283 S.W.3d 641, 652 (Ky. 2009).

[21] *Goodman v. Commonwealth*, No. 2013-SC-000813-MR, 2015 WL 1649308, at *2 (Ky. Feb. 19, 2015) (citing *Watkins v. Kassulke*, 90 F.3d 138, 141 (6th Cir. 1996)).

[22] *Jordan v. Commonwealth*, 703 S.W.2d 870, 872 (Ky. 1985).

[23] 284 U.S. 299 (1932).

[24] *Id.* at 304.

of conduct, as long as each statute 'requires proof of an additional fact which the other does not.'"[25]

In this case, Mills primarily supports his argument with *Lloyd v. Commonwealth*.[26] In *Lloyd*, the defendant walked into a pharmacy, pointed a gun at an employee, and demanded OxyContin.[27] He then took the drugs from the safe, put them in a bag, and fled.[28] Because of this incident he was convicted of first-degree robbery and theft by unlawful taking.[29] On appeal, Lloyd argued that his convictions for both of these offenses violated his right against double jeopardy because both convictions were related to a single theft.[30]

In addressing Lloyd's argument this Court first looked at whether a conviction for first-degree robbery and theft by unlawful taking, on its face, violated *Blockburger* and, by extension, *Burge*.[31] It held that "[s]trict application of the *Blockburger* test...standing alone, [would] lead to a conclusion that there is no double jeopardy violation...because each offense contains at least one element that the other does not."[32]

---

[25] *Commonwealth v. Burge*, 947 S.W.2d 805, 809 (Ky. 1996).

[26] 324 S.W.3d 384 (Ky. 2010).

[27] *Id.* at 386.

[28] *Id.*

[29] *Id.* at 385.

[30] *Id.* at 387.

[31] *Id.* at 387-89.

[32] *Id.* at 389.

However, this Court went on to note that "application of *Blockburger* [was] not the end of the analysis" because it must also "determine if the General Assembly intended for one theft to be prosecuted as both theft by unlawful taking and a robbery."[33] This Court concluded that the General Assembly intended to "prohibit convictions for both first-degree robbery and felony theft arising from **one underlying theft**."[34] Accordingly, Lloyd's conviction for theft by unlawful taking was reversed.[35]

*Lloyd* certainly remains good law. However, "[c]onstitutional prohibitions against [double] jeopardy do not extend to prosecution and punishment of **independent crimes committed during a single course of conduct**."[36] Therefore, we must determine whether Mills' conduct against Ms. Sutton constituted one underlying theft, or whether it can be considered two separate punishable crimes.

As previously discussed, Mills broke into Ms. Sutton's home, confronted her, and demanded her keys. When she tried to get her keys from her purse Mills pushed a door in on her, causing her to sustain a physical injury. She then gave him her purse and keys. At that point, he completed the crime of first-degree robbery. In other words, in the course of committing the theft of

---

[33] *Id.*

[34] *Id.* at 390 (emphasis added).

[35] *Id.* at 391.

[36] *Grenke v. Commonwealth*, 796 S.W.2d 858, 859 (Ky. 1990) (emphasis added).

14

Ms. Sutton's purse and keys, he used physical force with intent to accomplish that theft and caused physical injury to her.[37]

Mills then exited her home, walked to her Impala and, with intent to deprive her of it, drove off. At that time, he completed the crime of theft by unlawful taking.[38]

Accordingly, we hold that the facts were sufficient to establish that Ms. Sutton's robbery and the theft of her vehicle were two separate and distinct crimes. Mills' double jeopardy rights were not violated by his convictions for both crimes.

## D. The trial court did not err by failing to include jury instructions on second-degree robbery; theft by unlawful taking, value under $500; or unauthorized use of a vehicle

Mills argues next that the trial court erred by failing to instruct the jury on the lesser included offenses of: (1) second-degree robbery in relation to Ms. Sutton's robbery;[39] (2) theft by unlawful taking, value under $500, regarding

---

[37] *See* KRS 515.020(1)(a).

[38] *See* KRS 514.030(1)(a).

[39] This issue was preserved by Mills' tender of second-degree robbery instructions to the trial court. RCr 9.54 ("No party may assign as error the giving or the failure to give an instruction unless the party's position has been fairly and adequately presented to the trial judge by an offered instruction or by motion, or unless the party makes objection before the court instructs the jury, stating specifically the matter to which the party objects and the ground or grounds of the objection.").

each of the stolen vehicles;[40] and (3) unauthorized use of a vehicle regarding each of the stolen vehicles.[41]

Appellate courts review a trial court's ruling on jury instructions for abuse of discretion.[42] A trial court abuses its discretion if it acted arbitrarily, unreasonably, unfairly, or in a way unsupported by sound legal principles.[43]

In criminal cases such as this one, it is the trial court's duty to give instructions on the whole law of the case, i.e. any instruction reasonably supported by the evidence.[44] This duty extends to lesser-included offense instructions, but a lesser-included instruction

> is not proper simply because a defendant requests it. An instruction on a lesser included offense is required *only if*, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that the defendant is guilty of the lesser offense.[45]

Ergo, if the evidence presented at trial did not reasonably support giving a particular lesser-included offense instruction, the trial court had no duty to give said instruction. With these principles in mind, we will address each of Mills' asserted errors.

---

[40] This alleged error was preserved by Mills' oral motion to include a theft by unlawful taking, value under $500, instruction. RCr 9.54.

[41] This alleged error was preserved by Mills' oral motion to include an unauthorized use of a vehicle instruction. RCr 9.54.

[42] *Cecil v. Commonwealth*, 297 S.W.3d 12, 18 (Ky. 2009).

[43] *English*, 993 S.W.2d at 945.

[44] *Swan v. Commonwealth*, 384 S.W.3d 77, 99 (Ky. 2012).

[45] *Id.* (internal quotations omitted) (emphasis in original).

i. **Second-Degree Robbery**

Mills first argues that the jury should have been instructed on second-degree robbery in relation to Ms. Sutton's robbery. He reasons that one key difference between first-degree robbery and second-degree robbery is that first-degree robbery requires that the victim sustain a "physical injury," while second-degree robbery does not.[46] Therefore, he asserts, because the jury could have found Ms. Sutton did not sustain a physical injury, a second-degree robbery instruction was proper.

The definition of "physical injury" is the same for the entirety of Kentucky's penal code: "'[p]hysical injury' means substantial physical pain or any impairment of physical condition."[47] "Any impairment of physical condition" has been further interpreted to mean **any** injury.[48]

A good example of this definition for our purposes is *Hubbard v. Commonwealth*.[49] In *Hubbard* the victim, an elderly woman, was sitting on a bench when the defendant grabbed her purse so hard that it pulled her off the bench and onto the sidewalk.[50] The victim testified that she went to the

---

[46] *See* Kentucky Revised Statutes (KRS) 515.020 and KRS 515.030, respectively.

[47] KRS 500.080(13).

[48] *Covington v. Commonwealth*, 849 S.W.2d 560, 564 (Ky. App. 1992) (emphasis added).

[49] 932 S.W.2d 381 (Ky. App. 1996). *See also, e.g., Doneghy v. Commonwealth*, 410 S.W.3d 95, 564 (Ky. 2013) (holding that facial bruising and a cut under victim's eye constituted physical injury) and *Covington v. Commonwealth*, 849 S.W.2d 560 (Ky. App. 1992) (holding that a "small wound not past the epidermis, with no blood loss" constituted physical injury).

[50] *Id.* at 381.

hospital immediately after the robbery because of pain in her left hip, though an x-ray revealed no fractures.[51] She said her hip continued to hurt thereafter, but she did not seek any further medical treatment for it.[52] The Court of Appeals held that the victim's "testimony as to the pain in her hip both immediately following the robbery and thereafter is sufficient to establish that she suffered a physical injury."[53]

In this case Ms. Sutton testified that she was seventy-nine years old when the robbery occurred. She stated that when Mills pushed the bedroom door in on her the door scraped her arm causing a long abrasion down her left forearm. She got medical treatment for the injury, and it was sore for two to three weeks thereafter.

In addition, Tpr. Pruitt, who was dispatched to Ms. Sutton's home after her Impala was found on Mountain Drive, took a photograph of the abrasion. He testified that the injury looked worse in person than in the photograph because he had trouble with lighting. Nonetheless, the injury is still clearly visible in the photograph, which was entered into evidence.

Significantly, Mills did not cross-examine Ms. Sutton or Tpr. Pruitt regarding the injury, and he presented no evidence to dispute Ms. Sutton's injury or its severity.

---

[51] *Id.* at 383.

[52] *Id.*

[53] *Id.*

Accordingly, there was more than enough evidence in this case to find that Ms. Sutton suffered a physical injury within the meaning of KRS 500.080(13), while there was no evidence suggesting she did not. The trial court therefore did not abuse its discretion by declining to instruct the jury on second-degree burglary.

### ii.   **Theft by Unlawful Taking, Value Under $500**

Mills' next argument is that he was entitled to an instruction of theft by unlawful taking, value under $500, because the jury could have found that the value of each of the stolen cars was less than $500.

The difference between a theft that constitutes a felony and a theft that is a misdemeanor is the value of the item stolen. With some exceptions not at issue in this case, if the value of the stolen item is worth $500 or more, theft of that item is a felony.[54] Whereas, if the item is worth less than $500, theft of the item is a misdemeanor.[55]

Here, the Commonwealth presented evidence that Ms. Hensley's Malibu was worth $4,050, Ms. Sutton's Impala was worth $5,323, and Mr. Deitsch's Jeep was worth $7,400. These values clearly meet the statutory minimum to constitute a felony theft. Meanwhile, Mills presented no evidence whatsoever to contradict these values. Therefore, an instruction on theft by unlawful taking, value under $500, was in no way supported by the evidence. Accordingly, the trial court did not abuse its discretion in failing to include that instruction.

---

[54] KRS 514.030(2)(d).
[55] KRS 514.030(2).

19

### iii. **Unauthorized Use of a Vehicle**

Last, Mills argues he was entitled to a jury instruction on unauthorized use of a vehicle because the jury could have found that he lacked the intent to deprive each of the respective owners of their vehicles.

Unlike unauthorized use of a vehicle,[56] theft by unlawful taking requires that the perpetrator "[t]akes or exercises control over [the vehicle] of another **with intent to deprive him thereof**."[57] So, we must determine whether the evidence would have allowed the jury to conclude Mills lacked the intent to deprive Ms. Hensley, Ms. Sutton, and Mr. Deitsch of their vehicles.

A starting point for such analysis is of course to determine what is meant by "intent to deprive." A recent case of this Court, *Hall v. Commonwealth*,[58] grappled at length with this exact issue. In *Hall*, police officers conducted a traffic stop on Hall in relation to a recent theft.[59] However, Hall fled on foot as soon as he was stopped.[60] The officers pursued him on foot, but he was able to circle back and steal one of the officers' marked cruisers.[61] Two other officers immediately began pursuing Hall, and eventually saw him take the cruiser down a dirt road towards a strip mine before losing sight of him.[62] Officers

---

[56] KRS 514.100.

[57] KRS 514.030(1)(a) (emphasis added).

[58] 551 S.W.3d 7 (Ky. 2018).

[59] *Id.* at 11.

[60] *Id.*

[61] *Id.*

[62] *Id.*

20

later found the abandoned cruiser in a gully; Hall had it for a total of thirty minutes.[63]

Because of this incident, Hall was convicted of theft by unlawful taking, value over $500.[64] On appeal to this Court, he argued the conviction was improper because the Commonwealth failed to prove he intended to deprive the police department of its cruiser.[65] The *Hall* Court began its analysis by explaining that

> KRS 514.010(1) provides four definitions of deprive: 1) to withhold property of another permanently; 2) to withhold property for so extended a period as to appropriate a major portion of its economic value; 3) to withhold property with intent to restore it only upon payment of reward or other compensation; or 4) to dispose of the property so as to make it unlikely that the owner will recover it.[66]

The Court went on to discuss that the second, third, and fourth definitions of "deprive" could not reasonably apply in Hall's case.[67] But, regarding the first definition, this Court held that

> [a] defendant does not need to maintain actual possession over the taken property at all times after taking the property—a defendant can possess the intent to withhold property of another permanently if evidence exists showing that the defendant intended that the rightful owner never exert actual possession over the property again. In other words, **as long as evidence exists supporting the assertion that the defendant**

---

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.* at 12.

[67] *Id.* at 12-13.

21

**intended that the property never be restored to its rightful owner, the defendant need not maintain constant actual possession of the property to be said to have the intent to withhold the property of another permanently. A defendant can have the intent to withhold property of another permanently even if the defendant abandons the property.** The abandonment of property, rather than the restoration of the property to its rightful owner, means that the defendant is still preventing the owner from exerting actual possession over the property, i.e. the defendant is withholding the property from the rightful owner. But abandonment does not always mean that the defendant possesses the intent to withhold property of another permanently, because evidence could show that the defendant abandoned property with the intent that the property be restored to the rightful owner.[68]

The Court went on to hold that, based on the totality of the circumstances, no rational trier of fact could have determined Hall had the intent to deprive the police department of its cruiser.[69] The Court noted the following facts in support of its conclusion: "the taking of a marked police cruiser, not a civilian vehicle; the entirety of [the defendant's] resisting of arrest and his protracted flight from police[;] and [the defendant's] sudden abandonment of the cruiser in the roadway with police in hot pursuit."[70]

Thus, our next step is to determine which definitions of "deprive" are applicable in the case at bar. Clearly, Mills' theft of the vehicles cannot be said to fall under the second definition of "deprive": both Ms. Hensley and Ms. Sutton's car were found the same day they were stolen, and Mr. Deitsch's Jeep

---

[68] *Id.* at 13 (emphasis added).

[69] *Id.*

[70] *Id.*

was discovered eight days after it was taken. Likewise, this case does not fall under the third definition of "deprive": Mills never sought compensation for the return of any of the vehicles. Thus, we are left with the first and fourth definitions of "deprive." Accordingly, the next task is to ask whether the totality of the circumstances reasonably supported the conclusion that Mills either: (a) intended that the vehicles never be restored to their rightful owners; or (b) disposed of the vehicles in such a way as to make it unlikely that their owners would ever recover them.

First, there is Ms. Hensley's Malibu. That vehicle was stolen from a gas station in Bell County and abandoned at an unspecified location in Harlan County. We note at the outset that as soon as Mills abandoned the Malibu, he stole a Mustang from the same location. Of course, common sense suggests that, similar to *Hall*, this act would lead to the police being called to the scene, and the Malibu being discovered. However, we still believe this situation is distinguishable from *Hall*.

The most notable difference is, of course, that Hall stole a police cruiser, and officers began pursuing him immediately. Whereas here, Mills stole a civilian vehicle, and the police did not pursue him from the gas station to Harlan County. Finally, the distance from where the vehicle was stolen to where it was abandoned was much greater than in *Hall*.

Later, Mills stole Ms. Sutton's Impala from E.W. Miracle Drive and abandoned it on Mountain Drive. The exact location where the Impala was recovered on Mountain Drive is not provided in the record. However, the

23

distance from E.W. Miracle Road to Mountain Drive is roughly thirty minutes by vehicle.[71] Further, police had to take a 4x4 wrecker through a dense wooded area to retrieve the vehicle, as Mills wrecked it off of the road. Naturally the vehicle sustained some dents and scratches. Finally, the vehicle may have never been found if Mills did not call Natalie and tell her where he was.

Last, Mills stole Mr. Deitsch's Jeep from Pitman's Creek Road and abandoned it on Short Branch Road.[72] Pitman's Creek Road and Short Branch Road are about a thirty-minute drive from one another.[73] The Jeep was found in a densely wooded area, and photographic evidence demonstrated that it was nearly impossible to see the Jeep from the road. Indeed, the vehicle was not recovered until eight days after it was stolen. Finally, the Jeep's steering column was ripped out consistent with someone hotwiring the vehicle.

In addition, Mills' theory of the case was mistaken identity; that he was not the one who committed any of these crimes. Accordingly, he presented no

---

[71] Driving Directions from E.W. Miracle Dr. to Mountain Dr., Google Maps, http://maps.google.com (follow "Directions" hyperlink; then search starting point field for "E.W. Miracle Rd., Calvin, KY" and search destination field for "Mountain Drive Rd., Middlesboro, KY").

[72] We reiterate that, even if we were to hold that the trial court erred by failing to give an unauthorized use of a vehicle instruction regarding Mr. Deitsch's Jeep, it would not be reversible error, as Mills was acquitted of this charge.

[73] Driving Directions from Pitman's Creek Rd. to Short Branch Dr., Google Maps, http://maps.google.com (follow "Directions" hyperlink; then search starting point field for "Pitman's Creek Rd., Calvin, KY" and search destination field for "Short Branch Dr., Pineville, KY").

evidence whatsoever that he did not intend to deprive Ms. Hensley, Ms. Sutton, or Mr. Deitsch of their respective vehicles.

We hold that, considering the totality of the circumstances, the evidence reasonably supported the conclusion that Mills had the intent to deprive each of the respective owners of their vehicles. And, again, no evidence to the contrary was offered by Mills. Therefore, the trial court did not err by failing to give an instruction on unlawful use of a vehicle regarding any of the three counts.

## E. **Mills' directed verdict arguments were not properly preserved for appellate review.**

Mills' final argument is that the trial court erred by denying his motions for directed verdict on both his first-degree robbery charge and his multiple theft by unlawful taking charges. However, we hold these alleged errors were not properly preserved for our review and therefore decline to address them.

This Court has long held that

> to preserve an error based upon the insufficiency of the evidence the defendant must move for a directed verdict at the close of the Commonwealth's proof and must renew his motion at the close of all evidence: at the end of the defense case (if there is one), or, if there is rebuttal evidence[.] **We have also held that the motion must state specific grounds for relief and should identify which elements of the alleged offense the Commonwealth has failed to prove. Merely moving summarily for a directed verdict or**

25

**making a general assertion of insufficient evidence is not enough.**[74]

Here, Mills moved for a directed verdict at the close of both the Commonwealth's evidence and at the close of all the evidence. However, at the close of the Commonwealth's evidence, defense counsel requested that Mills be found not guilty on each count because the Commonwealth failed to prove "all of the elements of each offense charged." Then, at the close of all the evidence, defense counsel simply stated, "we would renew our motion for directed verdict." Neither of these motions were sufficient to preserve the error for our review because they did not state specific grounds for relief or identify the elements of each offense the Commonwealth allegedly failed to prove.

## III.  CONCLUSION

Based on the foregoing, we affirm Mills' convictions on all counts.

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Roy Alyette Durham, II
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Christopher Henry
Assistant Attorney General

---

[74] *Commonwealth v. Jones*, 283 S.W.3d 665, 669 (Ky. 2009) (emphasis added).