RENDERED:  AUGUST 12, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0876-MR

JACK MUSIC                                                                          APPELLANT

v.
APPEAL FROM JOHNSON CIRCUIT COURT
HONORABLE JOHN DAVID PRESTON, JUDGE
ACTION NO. 19-CR-00192

COMMONWEALTH OF KENTUCKY                                                  APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; MAZE AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE:  Jack Music appeals from the Johnson Circuit Court's

final judgment and sentence following his jury trial.  Music argues he should have

been granted a directed verdict on his first-degree assault charge because there was

insufficient evidence to prove serious bodily harm to victim Bradley Bricker or

Music should receive a new trial because he was denied due process given an *ex*

*parte* conversation between the Commonwealth Attorney and the circuit court

judge.  As the evidence was sufficient to establish the victim's gunshot constituted a serious and prolonged disfigurement and the *ex parte* exchange was harmless, we affirm.

On April 13, 2019, Music shot at Bricker twice with a 9mm gun.  One shot missed Bricker and the other shot traveled through Bricker's left arm and his chest, exiting out of the right side of his chest, leaving bullet fragments behind. The victim called 911.  When confronted by the police, Music admitted what he had done.

On June 19, 2019, Music was indicted for assault in the first degree and wanton endangerment in the first degree.  The wanton endangerment charge was later dismissed.

During the trial, Bricker testified he owned and serviced a vending machine in the apartment building where he was shot.  He explained he had been casually acquainted with Music for about a year and had done some handyman work for Music's grandmother who also lived in the same building.

Bricker testified he was attending to the machine outside the laundry room when Music approached and accused him of leaving human remains in his grandmother's kitchen.  Bricker testified he denied being in the grandmother's apartment.

Bricker recounted that Music left and then reappeared, dropped a plastic bag on the ground and then fired two shots at Bricker. Bricker testified that the first shot missed him, but as he raised his hands in self-defense and retreated to the laundry room, the second shot went through his arm and into his chest. Bricker explained he then called 911.

Bricker testified that his pain following the shooting was "excruciating." He recounted that approximately eight months after the shooting, in December 2019, he had surgery to remove some of the bullet fragments in his chest because they were still bothering him.

Officer Brian Runyon testified he responded to the 911 call and arrived to find Bricker seated in a chair and covered in blood that was dripping onto the floor. He found Music just outside the laundry room, standing beside the soda machine and found two spent shell casings on the ground beside the soda machine which he placed in evidence bags.

Pictures admitted into evidence show the drying puddle of blood on the laundry room floor, the removed gun clip and bullets, and the gun.

Captain Jonathan Holbrook testified he took Music's statement about the shooting and Music told him that the victim dirtied up his grandmother's kitchen and that was why he shot him. Music's written statement from that day was also admitted into evidence. It reads in full without correction:

I was doing oc work and being threntend by various people. I could hear various drilling sonds. I was getting veiled threats from this person reach as if for a weapon at that time I fired two shots one hit the man when I walked to see if he was hit he was trying to write something on the wall. [Sentences scratched out.] I will allow [illegible] to get my fire arm

4-13-19

[signed] Jack A. Music

Dr. Rudy Judhan testified by video deposition that Bricker suffered a gunshot wound to his arm and chest and was hospitalized for twenty-four hours after the shooting. Dr. Judhan noted that Bricker was treated with the pain reliever Fentanyl, which was the strongest pain medication of which Dr. Judhan was aware. Dr. Judhan also testified generally that a gunshot could cause substantial physical pain as well as physical impairment and could create a substantial risk of death without medical intervention.

Bricker's medical records were admitted into evidence. The records show he was transported via helicopter to the hospital, admitted, and diagnosed with having a gunshot wound which was alternatively described as a "puncture wound w/o foreign body." His left arm wound was described as "small circular dime size[,]" he had abrasions to his "RT lateral thorax/right chest[,]" pain to the touch and a small, round and bloody exit wound with drainage. Bricker's dressings were repeatedly changed, and he was noted to have "moderate bloody

-4-

drainage." He was put on oxygen, had a comprehensive blood panel taken, given medicine for pain, and given various scans, including computed tomography angiograph (CTA) scans of his chest and upper left arm.

The impression on the CTA of his chest was: "Subcutaneous edema and air noted within the anterior chest wall and left axillary region. A moderate size anterior left upper lobe infiltrate. And bibasilar atelectasis." The impression on the CTA of his upper left arm was: "Subcutaneous and soft tissue edema with subcutaneous air within the left axillary region and upper left arm without evidence of acute vascular abnormality."

Although Bricker was approved to be admitted to the hospital for two days, Bricker was discharged twenty-four hours later. Upon discharge, he received prescriptions for pain medication, which he was to gradually reduce over time.

Two pictures of Bricker's injuries were taken on July 15, 2019, about three months after the incident, which show the then existing damage left from the bullet wounds. The picture of Bricker's right chest shows a wide swath of dark purple lines and lighter blotching bruises/abrasions along with green and yellowing bruises. These wounds extend from perhaps an inch to the side of the victim's nipple and up from there, stopping just past an area parallel to the top of his "arm pit" and spanning a wide section of the breast tissue over to his arm.

It appears that the full area of the damage is not revealed as Bricker is shown pressing a square of gauze to one area within the bruising, with his hand covering the area above the nipple. A large bandage is peeled back towards his arm, with the bruising and lines appearing to continue beneath it.

The other picture shows the back of Bricker's left arm and a small round wound with reddish edges and a dark center that appears to be unhealed, with a small area below that of purple bruising. The injury to Bricker's arm depicted in that photo is confined to a much smaller area than the injury to his chest.

Music testified for the defense. He explained that on the morning in question, he went to his grandmother's apartment to feed his son breakfast and when he was returning to his own apartment from his grandmother's apartment, he noticed that a window lock was broken, and the door was ajar. Music explained he entered and began to look for intruders, and when he turned around, he saw Bricker standing in his doorway. Music testified he asked Bricker what he was doing, and Bricker reached into his pocket without answering and when Music told him to stop and Bricker did not comply, Music fired at him twice. Music testified that Bricker left and went into the laundry room and Bricker threw something down.

Music stated he then left to check on his son and grandmother and then returned to see if Bricker required assistance, learning then that Bricker had called 911. Music explained he then unloaded his gun and put it in his grandmother's apartment because he knew the police would be on their way. He testified he had been a Marine and fired two shots as he was trained to do to deal with threats.

When Music was asked about the difference in his statement to Captain Holbrook and his testimony at trial, he stated that his adrenaline was very high after the shooting and so he believed his memory of events was better at the time of the trial than it was on the day the shooting occurred.

Music asked for a directed verdict at the close of the Commonwealth's case and after the defense rested. The circuit court denied these motions.

The jury was instructed on first-degree assault, second-degree assault, and given a self-protection instruction. The jury found Music guilty of first-degree assault and recommended a sentence of ten years. The circuit court sentenced Music in accordance with this recommendation.

Music first argues that the circuit court erred in failing to grant his motion for a directed verdict on first-degree assault because the Commonwealth

could not satisfy any of the four possible grounds for establishing that Bricker

suffered a serious physical injury.

> When confronted with a motion for a directed verdict, "the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth" and "assume that the evidence for the Commonwealth is true, but reserv[e] to the jury questions as to the credibility and weight to be given to such testimony." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). "If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given." On appellate review, "the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt." *Id.* If the answer is yes, "then the defendant is entitled to a directed verdict of acquittal." *Id.*

*Swan v. Commonwealth*, 384 S.W.3d 77, 101-02 (Ky. 2012).

> KRS[1] 508.010(1) provides:
>
> A person is guilty of assault in the first degree when:
>
> (a) He intentionally causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument; or
>
> (b) Under circumstances manifesting extreme indifference to the value of human life he wantonly engages in conduct which creates a grave risk of death to another and thereby causes serious physical injury to another person.

---

[1] Kentucky Revised Statutes.

KRS 500.080(17)[2] defines "serious physical injury" as meaning "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ."

"Ultimately, a finding of first-degree assault is dependent on the seriousness of the resulting injury, not the potential of the act to result in 'serious physical injury.'" *McDaniel v. Commonwealth*, 415 S.W.3d 643, 658 (Ky. 2013). "[N]ot every bloody wound is a 'serious physical injury' . . . [n]o matter how brutal the attack or how gruesome the wound appear[s]" as its appearance "is insignificant. Rather than its awful *appearance*, it is the awful *effect* of the wound in creating a substantial risk of death, serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of a bodily organ that determines its legal status." *Hammond v. Commonwealth*, 504 S.W.3d 44, 53 (Ky. 2016) (footnote omitted).

We recognize that "not all gunshot wounds are serious physical injuries." *Swan*, 384 S.W.3d at 100. In *Luttrell v. Commonwealth*, 554 S.W.2d 75, 77, 79 (Ky. 1977), the Court concluded that the victim being shot with a ".38 slug," filled with birdshot, which resulted in superficial wounds, had not suffered a

---

[2] This provision has been renumbered from KRS 500.080(15) since Music was convicted; however, there is no change in the statutory language.

serious physical injury because while the victim "suffered from his wounds he was not seriously injured in the statutory sense." Similarly in *McDaniel v. Commonwealth*, 415 S.W.3d 643, 658-61 (Ky. 2013), a victim who suffered "a through-and-through gunshot wound to her right hand" with the immediate pain being "worse than childbirth" but who had "her wound . . . sutured and . . . was sent home the same night" and stated a week later that she had intermittent pain with the excruciating pain stopping two days after the incident, only "had to work 'a couple months' with a stress ball to regain strength in her hand[,]" "admitted that the only follow up treatment she had was to have her stitches removed[,]" and ended up with only a "small scar" was not established to have suffered either "serious and prolonged disfigurement" or "prolonged impairment of health" requiring reversal of a conviction for first-degree assault.

In contrast, a jury question was properly presented in *Hunter v. Commonwealth*, 587 S.W.3d 298, 311 (Ky. 2019), where the shooting victim went to the emergency room "present[ing] with a gunshot wound on the side of her leg and another wound on the back side of her calf[,]" "did not suffer any bone fractures or injuries to her blood vessels[,]" "was admitted to the hospital for a couple of days[,]" "prescribed physical therapy[,]" and testified that five years later "it was still 'kind of hard for [her] to walk[,]'" she "must lift up her whole left leg

to walk[,]" "has decreased mobility in her left foot[,]" and "still suffers from sharp pains in her left foot."

Similarly, in *Swan*, 384 S.W.3d at 99-101, the Court examined whether the jury should have been instructed on the lesser included offense of second-degree assault as to both victims and concluded that it should have been as the evidence could support either serious physical injuries or physical injuries, making that a jury issue. The evidence the jury had to consider in *Swan* as to victim #1 was his testimony that "he was shot two times, once in the thigh of the left leg from the side and once in the ankle of the right leg[,]" "the shot to his thigh left a scar and had hit his sciatic nerve" and resulted in him "suffer[ing] pain daily and [being] unable to lift his foot[,]" "the shot to his ankle left no lasting effect other than a scar[,]" and in the recording "when he walked over to show the jury the scar on his ankle, he appeared to limp slightly." *Id.* at 99. In victim #1's testimony about the initial aftermath of being shot, he explained he "was carried out on a stretcher and taken straight to the hospital[,]" "given painkillers but admitted that he was released from the hospital after only 'a couple of hours[,]'" and "had a few follow-up doctor appointments after that" with the last one having "been a while" ago. *Id.*

Victim #2 in *Swan* "testified that he was shot in the thigh, with the bullet passing from the back to the front of the leg, which left a scar[,]" "right after

-11-

the shooting, he could not walk without crutches[,]" he "claimed that the bullet had injured his sciatic nerve, which still affected his foot and left him with a 'slight limp[,]'" and "[o]n the video, when he stepped down from the witness stand to point out some things on an exhibit, his limp was barely perceptible and appeared to be at most a very slight one." *Id.* at 100. Victim #2 testified that after being shot he "was able to crawl out of the house[,]" "was taken to the hospital and released later the same day[,]" recommended to participate in physical therapy, which he did "but was no longer in therapy 'due to financial reasons[,]'" with [h]is last medical appointment . . . a year before." *Id.*

The Court in *Swan* emphasized that it was up to the jury to determine whether the victims' physical behavior in walking showed their claimed injuries to be exaggerated and emphasized there was no medical proof in the form of testimony or medical records offered. *Id.* at 101. The Court explained:

> The evidence established injuries that fell somewhere in the gray area between mere physical injury and serious physical injury. The decision as to which type of injury actually occurred required close observation of the victims' behavior, attention to their testimony, and overall interpretation of the evidence. That function could only be carried out by the jury, not the judge.

*Id.*

Given this authority, we now consider whether the jury could have properly found that Bricker suffered a serious physical injury. The

Commonwealth first argues that Bricker suffered serious physical injury because he suffered serious and prolonged disfigurement. The Commonwealth emphasizes that Bricker was left with bullet fragments in his chest which had to later be surgically removed. The Commonwealth also points to the photographs taken about three months after Bricker's injury and states that "[e]xtensive scarring was clearly visible, even if those scars were not yet completely healed. There was still bruising and discoloration all around the area of the wound."

We agree that the photographs showed unhealed wounds that covered several square inches of Bricker's chest. While the wound to Bricker's arm may have eventually resulted in a small scar, the exit wound was of unknown size, and may be inferred to be the more serious wound of the two as Bricker did not fully uncover it and the discoloration around it was extensive. It may also be inferred that the dark purple "lines" were the result of continued bleeding, perhaps caused by the bullet fragments still lodged in his chest.

The Commonwealth also argues that Bricker suffered a serious physical injury because he suffered prolonged pain from his injuries. As explained in *Parson v. Commonwealth*, 144 S.W.3d 775, 787 (Ky. 2004), *overruled on other grounds by Shields v. Commonwealth*, __ S.W.3d __, 2022 WL 575214 (Ky. Feb. 24, 2022), "pain is an 'impairment of health.' If the pain is substantial, but not

-13-

prolonged, it constitutes a 'physical injury;' but if it is prolonged, then it is a 'serious physical injury.'"

There was evidence that Bricker was in excruciating pain after being shot, was administered the strongest pain killer available, and sent home with prescription pain medicine. However, initial pain is not enough as discussed in *McDaniel*. But unlike in *McDaniel*, Bricker testified about suffering from bullet fragments lodged in his chest, which resulted in him having surgery some eight months later to remove some of these bullet fragments which were "giving him trouble." The jury could reasonably infer this trouble was prolonged pain, and that pain was substantial for him to be willing to have surgery to remove them, and that Bricker's pain problems were not necessarily entirely resolved after surgery as he still had existing bullet fragments remaining.

It may further be inferred that Bricker's injury is extensive as the trajectory of the bullet traveled through his arm, exiting on the far side of the chest and as noted on the CTA, penetrated and traveled through a lobe of his lung. The trajectory of the bullet appears to have passed through much more tissue than the hand wound in *McDaniel*, or the leg wounds in *Hunter* and *Swan*. Additionally, while the pictures showed ongoing surface damage, it can be inferred that further damage to Bricker's lung remains hidden. We do not discount that in hearing Bricker's testimony, the jury was in the best position to judge whether Bricker was

-14-

the sort of person who would underplay his injuries as he did not like to display weakness, vulnerability, or complain, and could decide on their seriousness accordingly. We believe this evidence was sufficient to allow the jury to determine whether Bricker suffered a serious physical injury or just a physical injury. Therefore, the circuit court did not err in failing to direct a verdict on the first-degree assault charge.

Music next argues he was denied due process and his conviction must be reversed based on improper *ex parte* comments between the circuit court and the Commonwealth Attorney. Music argues he was not able to object to these *ex parte* comments because he did not know they were made at the time, and they should be reviewed as if preserved or at least considered under the palpable error standard.

On the video of the trial, while the jury was being excused so that the parties could discuss the jury instructions, Music recounts an exchange that he believes was improper between the circuit court judge and the Commonwealth attorney, after the Commonwealth Attorney approached the bench (before defense counsel). We have reviewed this exchange.

> Circuit court judge (whispering): [inaudible] shell casings were found.

> Commonwealth Attorney (normal volume): I can't hear a word you're saying.

-15-

Circuit court judge (slightly louder): I had to look at my notes to see where the shell casings were found.

Commonwealth Attorney (normal volume): Yup.

Circuit court judge (still whispering): That's the key.

Then the circuit court judge, with his voice at a normal volume, called defense counsel up to the bench.

Music states the circuit court judge by making those statements was not acting impartially and instead offered advice to the Commonwealth about a material aspect of the trial as the shell location was relevant in determining whether Music fired the shots in self-defense from within his apartment. Music explains that during the closing argument, the Commonwealth reminded the jury about where the officers located the shell casings and even called them "your smoking gun." He argues that "[t]he judge's actions impugned the impartiality of the tribunal and demonstrated an appearance of bias toward the prosecution. The judge's comments seeped into the closing of the Commonwealth and provided an unfair tactical advantage."

The Commonwealth disagrees, arguing that if an error occurred it was harmless as the judge's comment played no part in Music's conviction because the judge merely pointed out something that the Commonwealth already knew and had established through testimony, and there is no evidence it had any effect on the

-16-

Commonwealth Attorney's closing argument. The Commonwealth also argues that the evidence against Music was overwhelming.

We note that judges are ethically required to avoid even the appearance of impropriety or lack of impartiality and should not engage in *ex parte* discussions with counsel. *See* Kentucky Supreme Court Rules (SCR) 4.300: Canon 1, Rule 1.2 and Comments (3) and (5); Canon 2, Rule 2.2 and Comment (1); Rule 2.3(A) and Comment (1); and Rule 2.9(A) and Comment (1). However, we believe the judge's comments, if ill-advised, were harmless.

Kentucky Rules of Criminal Procedure (RCr) 9.24 provides in relevant part:

> No error . . . in anything done . . . by the court . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties.

"The test for harmlessness is whether the error substantially swayed the verdict." *Allen v. Commonwealth*, 395 S.W.3d 451, 467 (Ky. 2013).

In discussing *ex parte* conversations between the trial judge and individual jurors, the Kentucky Supreme Court has opined that "[m]ost of these ex parte contacts are innocuous because they do not concern issues central to the case,

and they are harmless because the contact does not impugn the fundamental fairness of an otherwise constitutionally acceptable trial." *Welch v. Commonwealth*, 235 S.W.3d 555, 558 (Ky. 2007) (footnote omitted). The Kentucky Supreme Court has also "previously held that an isolated improper comment [to the jury] which was not intended to violate the constitutional right of the defendant or to inject a factually false allegation would be harmless error." *Crane v. Commonwealth*, 833 S.W.2d 813, 819 (Ky. 1992). *See Abernathy v. Commonwealth*, 439 S.W.2d 949, 953 (Ky. 1969), *overruled in part on other grounds by Blake v. Commonwealth*, 646 S.W.2d 718 (Ky. 1983) (explaining trivial "exchanges between court and counsel within earshot of the jurors in which it is argued that the trial court put counsel in a bad light" could not have improperly influenced the jury). *See also Shawnee Telecom Resources, Inc. v. Brown*, 354 S.W.3d 542, 550-51 (Ky. 2011) (concluding that judge's isolated "wry" or "ironic" comment after granting a motion for attorney fees and costs that the case was apt to be referred to another judge because "I am sure I will be accused of being prejudiced[,]" when there was nothing else in the history of the litigation to suggest bias, did not require recusal for creating the appearance of bias).

Music has provided nothing but his own supposition that the judge's remarks were intended to benefit and/or did indeed benefit the Commonwealth

-18-

Attorney by changing his strategy. Music has also failed to identify any other incidents in which he believes the circuit court judge was acting biased or favoring the Commonwealth.

The Commonwealth Attorney was already aware of the location of the spent bullet casings, as such information came from testimony he had specifically elicited for purposes of both proving the elements of Music's crime and discrediting Music's assertion of self-defense. We also do not believe that emphasizing the location of the bullet casings was likely to have any substantive effect on the ultimate verdict given the evidence against Music and the differing statements he had made regarding why he shot Bricker. Therefore, we conclude that while the circuit court judge's *ex parte* statements to the Commonwealth Attorney were unseemly, they were ultimately harmless.

Accordingly, we affirm the Johnson Circuit Court's conviction of Music.

ALL CONCUR.

| BRIEFS FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Jennifer Leigh Wade<br>Frankfort, Kentucky | Daniel Cameron<br>Attorney General of Kentucky |
| | Jenny Lynn Sanders<br>Assistant Attorney General<br>Frankfort, Kentucky |